UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA *
V. * Case No: 2:23-cr-34-1
OTMANE KHALLADI *

MOTION TO SUPPRESS EVIDENCE RECOVERED FROM CELL PHONE
AND MOTION TO SUPPRESS EVIDENCE OBTAINED VIA SUBPOENA
JULY 11, 2024
BURLINGTON, VERMONT

BEFORE:
THE HONORABLE WILLIAM K. SESSIONS III
District Judge

APPEARANCES:

Nathanael T. Burris, Esq. and Paul J. Van de Graaf, Assistant United States Attorneys, P.O. Box 570, Burlington, VT 05402-0570; Attorneys for the Plaintiff.

Steven L. Barth, Esq., Assistant Federal Public Defender, 95 Pine Street, Suite 150, Burlington, VT 05401; Attorney for the Defendant.

Court Reporter: JoAnn Q. Carson

CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT 05402-0329
(802/800) 863-6067
E-MAIL: Info@capitolcourtreporters.com

I N D E X


| Witness | Page |
|---|---|
| Anders Ostrum | 6 |
| Direct Examination by Mr. Burris | 6 |
| Cross Examination by Mr. Barth | 56 |
| Redirect Examination by Mr. Burris | 96 |
| Recross Examination by Mr. Barth | 98 |

| Exhibits | Admitted |
|---|---|
| Government | |
| 1 | 8 |
| 2 | 10 |
| 3 | 54 |
| 4 | 12 |
| 5 | 21 |
| 6 | 29 |
| 7 | 31 |
| 8 | 32 |
| 9 | 37 |
| 10 | 40 |
| 11 | 38 |
| 12 | 35 |
| 13 | 37 |
| 14 | 39 |
| 15 | 42 |
| 16 | 47 |
| 17 | 48 |
| 18 | 49 |
| 19 | 49 |
| 20 | 52 |
| 21 | 53 |
| Defense | |
| A | 74 |
| B | 86 |
| C | 92 |
| D | 92 |
| E | 78 |
| F | 71 |
| I | 93 |
| J | 93 |
| L | 61 |
| M | 76 |
| N | 93 |

[Beginning at 2:10 p.m.]

THE COURT: Good afternoon.

DEPUTY CLERK: This is criminal case number 23-34 defendant number 1 United States of America versus Otmane Khalladi. The Government is present through Assistant United States Attorneys Paul Van de Graaf and Nathanael Burris. The defendant is present with his attorney Assistant Federal Public Defender Steven Barth. The matter before the Court is a hearing on motion to suppress evidence recovered from cell phone and motion to suppress evidence obtained via subpoena.

THE COURT: Well there are actually three motions to suppress. The last that was mentioned is from cloud and I assumed that we were addressing that as well; is that correct?

MR. BURRIS: Your Honor, the Government's intention would not be to address that motion at this point. The deadline for Government's response to that motion is I believe still a week away, and so at this point given the timing of that filing and the close proximity of the hearing we would like to proceed with the Smith motion and Grand Jury subpoenas.

THE COURT: All right, but you're not suggesting that we have another evidentiary hearing in regard to that third motion to suppress, are you?

MR. BURRIS: Based on my review of the motion thus far I don't think it calls for an evidentiary hearing. I believe it's primarily a legal argument related to the sufficiency of the nexus between the iCloud account at issue and the probable cause set forth in the affidavit.

THE COURT: Okay. Mr. Barth, what's your view?

MR. BARTH: Your Honor, I think that's probably true.

THE COURT: Pardon me.

MR. BARTH: I think that's probably true that likely the iCloud is something that can be decided on review of the four corners of the warrant.

THE COURT: Okay. All right. So then we would just be dealing with the two motions to suppress. So how do the lawyers wish to proceed?

MR. BURRIS: Your Honor, with regard to the Smith motion I have sort of preliminary argument I would like to make as to whether an evidentiary hearing is even necessary, and I would defer to the Court whether it would like to begin with the Smith motion or hear argument as to the motion related to the subpoenas. The evidentiary testimony, to the extent the Court thinks it's necessary, would relate only to the Smith motion.

THE COURT: Well I guess my concern is that if

you have got any witnesses that it would be helpful to know relatively quickly whether they need to testify and do you think -- well do you think it would be helpful for your cause to address the legal argument and not call witnesses or would -- I just want to make sure the witnesses get done. Call the witnesses first and then we can have legal argument.

MR. BURRIS: If I may have just a moment. We do have the witness present and we would be prepared to proceed with calling a witness, Your Honor.

THE COURT: Yeah I guess I would like to have the witness first before we have the argument so you may call the witness.

MR. BURRIS: Your Honor, before calling the witness if counsel and I may briefly approach sidebar?

THE COURT: Okay. Yes.

MR. BURRIS: Your Honor, the Government would be prepared to call our first witness.

THE COURT: Okay.

MR. BURRIS: Your Honor, the Government calls IRS Special Agent Anders Ostrum.

COURTROOM DEPUTY: Ask you to state your first and last name and spell it as well for the record.

AGENT OSTRUM: Anders Ostrum A-N-D-E-R-S O-S-T-R-U-M.

COURTROOM DEPUTY: Thank you. Please raise your right-hand. Do you swear or affirm under the penalties of perjury that the evidence you shall give, relative to the cause now under consideration, shall be the whole truth and nothing but the truth. If so, please say I do.

AGENT OSTRUM: I do.

COURTROOM DEPUTY: Thank you. You can be seated.

THE COURT: Good afternoon, Agent Ostrum.

AGENT OSTRUM: Good afternoon.

DIRECT EXAMINATION:

BY MR. BURRIS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Could you please state your name?

A. Special Agent Anders Ostrum.

Q. And are you currently employed?

A. I am.

Q. By whom?

A. I work for IRS Criminal Investigation.

Q. And in what capacity are you employed there?

A. I'm a Special Agent criminal investigator.

Q. And generally could you describe your job duties and responsibilities as a Special Agent?

A. Sure. I investigate potential criminal violations

of the Internal Revenue Code and related financial crimes such as money laundering, Bank Secrecy Act violations, things like that.

Q. Now in your capacity as a Special Agent did you become aware of any federal criminal cases related to an individual name Otmane Khalladi?

A. Yes I did.

Q. And what is the first case you became aware of?

A. There was a case out of the Northern District of New York. That was the first case I became aware of.

Q. And do you have a general understanding of the allegations in that case?

A. It was a -- it was a money laundering case as I understand it.

Q. And are you aware of whether or not Mr. Khalladi was detained or released in connection with that case?

A. He was released.

Q. I'm going to show you what is marked as the Government's exhibit number 1. Do you see that on your screen?

A. Yes I can.

Q. Do you recognize this document?

A. Yeah this is a document from the United States District Court in the Northern District of New York. It's an order setting the conditions of release for Mr.

Khalladi in that case.
Q. And is it your understanding that this document pertains to the criminal case you mentioned a moment ago?
A. Yes.
Q. Have you reviewed this document before?
A. I have.
Q. I'm going to direct your attention to page 2 of the document and specifically section 7(J). Can you read that section?
A. Yes. It says to remain at an authorized address as approved by pretrial services or the court.
Q. Now do you have an understanding of where the authorized address was located?
A. Yes. The authorized address was 805 South Miami in downtown Miami, Florida.
MR. BURRIS: Your Honor, the Government would move to admit exhibit number 1.
THE COURT: Any objection?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government Exhibit 1 admitted]
BY MR. BURRIS:
Q. Now in your role as a Special Agent were you assigned to participate in a separate investigation into Mr. Khalladi?

A. Yes I was.
Q. And generally speaking what was the nature of that investigation?
A. It was a grandparent fraud case, elder fraud case, involving widespread wire fraud and money laundering conspiracy.
Q. And are you aware of whether or not Mr. Khalladi was indicted in connection with that case?
A. Yes he was.
Q. And are you aware of whether or not an arrest warrant was issued in connection with the indictment?
A. Yes there was an arrest warrant issued.
Q. Now directing your attention to what is marked as the Government's exhibit number 2 do you recognize this?
A. Yes. This is an application for a search warrant to be served on AT&T for cellular device assigned 305-336-2667.
Q. And do you have an understanding of who that cell phone number was assigned to?
A. It was assigned to Mr. Khalladi.
Q. And what was the purpose of this particular warrant as you understood it?
A. This -- this warrant was signed on April 10, 2023. The purpose was for AT&T to provide historical as well as prospective location information associated with the

device that was assigned to the particular phone.
Q. And who was the affiant for this particular warrant?
A. Special Agent Paul Altenburg from Homeland Security Investigations.
Q. And was Special Agent Altenburg also participating in the same investigation?
A. Yes. Paul is a co-case agent on the case that includes myself as well as HSI task force officer.
Q. Now with regard to the location information was there any purpose behind this warrant aside from seeking to locate Mr. Khalladi for purpose of his arrest?
A. That was the intended purpose for the warrant.
MR. BURRIS: Your Honor, the Government would move to admit exhibit number 2.
THE COURT: Any objection?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government exhibit 2 admitted]
BY MR. BURRIS:
Q. Now was a second warrant obtained in connection with the investigation?
A. Yes it was.
Q. And what was the nature of that warrant?
A. It was a search warrant for the residence of Mr.

Khalladi.
Q. Show you now what is marked as the Government's exhibit number 4. Do you recognize this?
A. Yeah this is the search warrant I just -- I just spoke of. It's the 805 South Miami Avenue Apartment 2004. This is the search warrant for Mr. Khalladi's residence.
Q. And the address in the heading of the search warrant is that the same address you mentioned a moment ago related to Mr. Khalladi's Northern District of New York conditions of release?
A. Yes it is.
Q. Now do you know what a collateral is?
A. Yes I do.
Q. And can you explain what a collateral is?
A. Sure. It's common in law enforcement working with other districts that you may need to execute a search warrant or arrest warrant or you may need interviews performed outside of where you generally do business. So in my particular case I'm assigned to Vermont, but oftentimes in cases I may need a witness interviewed in California or any other state. That was an example. You also may be needing to execute a residential search warrant, which was the case here, and you need assistance from other law enforcement agents in that area where you intend to execute the warrant, and so a collateral -- we

refer to as a collateral case, it's basically a request for assistance. So a collateral case is the file is opened and agents are assigned from that particular district that you intend to travel to seek assistance.
Q. And are you aware of whether or not a collateral request was made in connection with this particular warrant?
A. Yes. There was a collateral request sent to the Miami office of HSI.
Q. And was anyone assigned to the collateral request?
A. Yeah you know this is internal to HSI, but as far as my understanding goes Kevin Selent and Andrea Randou were the two collateral case agents that were assigned and they work in the Miami area.
Q. And Kevin Selent and Andrea Randou are special agents of HSI in the Miami field office?
A. Yes that's correct.
MR. BURRIS: Your Honor, at this point I would move to admit exhibit number 4.
THE COURT: Any objection to 4?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government exhibit 4 admitted]
BY MR. BURRIS:
Q. Now do you have an understanding of the process

that was undergone to obtain this particular residential search warrant?

A. I wasn't the person who swore out the warrant or prepared the affidavit so I'm not -- you know I'm generally familiar with what the process would look like, but I'm not familiar with the details of how it all went down the week before because I wasn't the agent handling it, but generally if you have a search warrant in other districts, in this case there was a residence in Miami, and you need to obtain a warrant out of the appropriate district and that would require coordination with the U.S. Attorney's Office down in that area as well as coordination with the Magistrate Judge and the District Court down there as well.

Q. Have you spoken with Special Agent Altenburg about that process with regard to this specific warrant?

A. Yes I have.

Q. And do you have an understanding as to whether that was a generally brief process or a more lengthy process?

A. As compared to what we would experience or how I have experienced it in the District of Vermont it was explained to me as more of a lengthy process, slightly more cumbersome than it has been, and in other cases I participated in Los Angeles for one seemed it was an easier process there than it was in this case in Miami.

Q. Now at some point did you become aware that Agents Selent and Randou were engaged in some investigative activities before the execution of the warrant?
A. Yes.
Q. And what did you learn about those activities?
A. Several things are done. Usually in a search warrant situation there's presearch warrant execution. You would typically undertake surveillance which was done in this case by those agents and agents down there helping them; retrieval of lease agreements, talking with the building manager of the particular location of the search site. So things like that were -- are typically done and were done in this case including verification that Mr. Khalladi was seen at that location in the week before the execution of the search warrant.
Q. Now at some point did you travel to Miami for purposes of execution of that warrant?
A. I did.
Q. And that's again the warrant in exhibit number 4 that you just reviewed?
A. Correct.
Q. And did you review the location information associated with the warrant that was detailed in exhibit number 2?
A. Yes I did.

Q. And what did you learn based on that location information?
A. The -- well before going down we understood that Mr. Khalladi -- the cellular device that we previously talked about -- was present in the Miami area.
Q. And why was that important to you?
A. When you undertake a search warrant in other districts, especially one that requires a decent amount of travel from Vermont all the way down to Miami, we also had an arrest warrant which is important to know because an arrest warrant as well as a search warrant, in particular for the search warrant we would want to verify that the individual that we intend to go arrest is actually present at the place we believe them to be or will be, and so it was important to understand and confirm that we were in the right spot. So it's for intel purposes, efficiency purposes, things like that.
Q. Did the cell phone associated with that particular call number ending in 2667 have any evidentiary significance?
A. Yes. So in addition to confirming the location of Mr. Khalladi, presumably he would be with the cell phone that we believed to be his, the cell phone was important to us in this case because it was an important piece of evidence that we intended to seize, and part of our

residential search warrant spoke to seizing Mr. Khalladi's electronic devices. So that piece was also important.

Q. Now directing your attention back to exhibit number 4 page 22 have you reviewed this section of the search warrant application and affidavit?

A. Yes.

Q. And what is the significance of this particular section?

A. The significance is that it speaks to some of the items that we intend to seize. I had previously mentioned the electronic devices. So this section speaks to the entirety of stored media. That would include cell phones.

Q. Now directing your attention to the following page, page 23 paragraph 26, can you describe this particular section of the search warrant application?

A. Basically -- I mean I can read it, but essentially says that I'm applying for -- the warrant I'm applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant.

Q. You mentioned a moment ago that the phone associated with call number ending in 2667 had evidentiary significance. Is that why this particular section was included in the warrant?

A. Yes.

Q. Now finally on the next page 24 paragraph 27 can you describe the significance of this section of the warrant application?

A. Yes. So this section speaks to biometrics. Essentially the affidavit is requesting that we are permitted to use Mr. Khalladi's physical biometric characteristics to get access into any electronic devices that we would encounter. We fully expected there to be a cell phone and based on our training and experience these cell phones sometimes require a fingerprint or they may require a facial recognition, and so this warrant application would allow us to basically take the phone and use Mr. Khalladi's physical characteristics to gain access to that phone, and basically that ensures that we're able to get into the phone, unlock it which would decrypt the data, and it would enable us to eventually perform full extraction of the data that was in that phone. So getting into the phone is a critical -- it's a critical component to seizing digital evidence.

Q. And fair to say there was a significant goal of the search warrant?

A. Yes.

Q. Now you mentioned traveling to Miami. Did anyone else travel with you?

A. Yeah I traveled down with HSI Special Agent Paul

Altenburg, HSI Agent Chris Pike, and IRS Special Agent Josh Feniff (phonetic).

Q. And do you recall the date on which the warrant was executed?

A. April 12, 2023.

Q. At what time was the warrant executed?

A. Approximately 6 a.m.

Q. Were any investigative activities conducted prior to 6 a.m.?

A. There was -- we -- typically you do a meet at the station location with the team that is assisting in the execution of the search warrant, arrest warrant. So that would have happened before 6 a.m.

Q. And did you review any of the data associated with the prospective location warrant?

A. Yeah so during that premeet before the execution of the search warrant we reviewed some of the prospective location information that AT&T was providing us pursuant to that separate warrant.

Q. And generally speaking what did that information show?

A. It showed Mr. Khalladi was in the Miami area. At the time we were meeting AT&T confirmed that it appeared that that device was approximately a mile, mile and a half north of where the search site location was.

Q. And was this a topic of discussion amongst the investigative team?

A. Yes. So we were there really to do two things. One, execute a search warrant and, two, execute the arrest warrant, and so it was the topic of conversation. Obviously if Mr. Khalladi is not in the place we believe him to be that's a problem where he's half of what we're there to do, and so the Miami agents opined in that group conversation that they believed that the location information could be inaccurate because we were in downtown Miami with lots of high rise buildings and there was a chance that some of the signals were causing some error in the actual location for where that device was. So that was kind of what we were discussing.

Q. And as a result of that discussion what, if anything, did you decide to do?

A. We decided to execute the search warrant at the location that we were staged and ready to proceed with.

Q. And can you just generally describe the location that the search warrant was executed at?

A. Yes. Downtown Miami. I'm not from Miami but I would describe it as kind of south in downtown, but it's the southern part of downtown and you know there's lots of tall buildings. This was a -- from what we understand a luxury condominium building. It was a very nice building,

had lots of staff working. That's how I would describe it.

Q. And can you describe what happened when the warrant was initially executed?

A. So when we made entry into the condo several -- two individuals were encountered. Other than those two individuals there was no one else present and neither of those two individuals was Mr. Khalladi.

Q. Who were the two individuals?

A. One was his brother Neal (phonetic) Khalladi and another was a roommate David Green.

Q. And at any point did you speak with Mr. Green?

A. I did.

Q. And can you describe the conversation you had with Mr. Green?

A. Yeah I can. After we realized Mr. Khalladi was not on site some, myself included, kind of led the charge on figuring out where he was. So I talked with Mr. Green who was able to give us enough information to basically drive over to Mr. Khalladi's girlfriend's residence. She was described as -- to us by Mr. Green and Mr. Khalladi was encountered at that separate address which was about a mile and a half more. So I believe by the time we executed the warrant was around 6 until we encountered Mr. Khalladi at the separate location was about an hour and a

half. Around 7:30 I think he was encountered.
Q. And did Mr. Green give you any information about where Mr. Khalladi's primary residence was located?
A. I'm not sure he confirmed his primary residence. What he did tell me was that Mr. Khalladi was rarely at 805 South Miami. Again that's the search warrant location. That was where we believed his primary residence was. Mr. Green said he rarely came there and that he would stay frequently, you know, away from that address and allude to he would stay with his girlfriend.
Q. I'm going to show you now what is marked as exhibit number 5. Do you recognize this?
A. Yeah that's a map of where the search site location was. That is the most southern point, the 805 South Miami Avenue, that's the search site location, and the address at the top of the page 25 Northeast Fifth street is the apartment building of where Mr. Khalladi was ultimately arrested.
MR. BURRIS: The Government would move to admit exhibit number 5.
THE COURT: Any objection to 5?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government exhibit 5 admitted]
BY MR. BURRIS:

Q. Now can you describe what happened next?
A. Sure. So after Mr. Green filled us in on some of the details of where Mr. Khalladi might be I took a car with several agents from HSI Miami to the address we just looked at, his girlfriend's place, and I stayed with Mr. Green while a separate group of agents in a separate car actually went into the building and ultimately located Mr. Khalladi at his girlfriend -- in his girlfriend's apartment.
Q. And do you have any understanding of who those agents were?
A. Andrea Randou and Kevin Selent and agents that were ultimately in the collateral case were present in going upstairs to the apartment and locating Mr. Khalladi.
Q. And do you have any knowledge as to whether anything was seized from Mr. Khalladi at that time?
A. Yeah so when he was encountered Mr. Selent seized a phone from Khalladi's person -- Mr. Khalladi. Excuse me.
Q. And what was the type of phone that was seized?
A. It was an iPhone.
Q. Now where was the remainder of the investigative team while Agent Selent was with Mr. Khalladi?
A. They were back at the search site location conducting investigative tasks related to finishing that search warrant. So it's searching, processing evidence,

most of the team was doing that. There was a handful that was at the site where Mr. Khalladi was encountered.

Q. And was anything in fact seized pursuant to the search warrant?

A. Yes. There were a number of items seized pursuant to the search warrant.

Q. Did those items include any electronic?

A. Yes. There were some phones seized from that site.

Q. Now after the execution of the warrant was completed where were the electronics brought?

A. They were brought back to HSI Miami's office.

Q. And was there a particular group within the HSI Miami office that was involved with any of this evidence?

A. The principal discussion surrounding the evidence occurred between HSI Special Agent Altenburg from Vermont and there was also the forensic group there was involved because the computer electronics would be stored ultimately with them.

Q. And were any of the items seized whether up through the search warrant or from Mr. Khalladi's transfer to this forensic group?

A. Yes so I can't -- I don't recall -- the electronic devices that were seized from the search site I don't recall if those were stored at the forensic group. I do recall that Mr. Khalladi's phone seized on his person upon

the execution of the arrest that was immediately transferred to the forensic portion of the office because when Mr. Khalladi was encountered that phone was in a powered-on state which is important to note when you're seizing electronic evidence. So it was important for us to take that powered-on phone and get it plugged in, in the forensics office inside a faraday box.

Q. What is a faraday box?

A. They make faraday bags or boxes. It's essentially a device where you place electronic devices into that device and it basically acts as a shield to prevent incoming signals to that phone or outgoing signals. Essentially there is a mechanism to kind of protect the integrity of the data that's on that phone so it can't be manipulated. It's real easy for someone to log on and remotely access their phone if it's getting signals and wipe that phone. So erase data, alter data. So you're trying to prevent that when you place a phone inside a faraday box or faraday bag.

Q. And specifically is it your understanding that the faraday box here would prevent Mr. Khalladi's iPhone from being remotely wiped?

A. Right. That's right.

Q. Now do you have any -- in your role as a Special Agent do you have any knowledge or experience with

forensic extraction of cell phones?
A. I have limited. I'm not a -- I'm not an IT person. I'm not a forensic analyst, but I do have some general knowledge based on my training, experience, talking with the guys that do this for a living.
Q. And you mentioned before that the iPhone was seized in a powered-on state. Based on your general knowledge of forensic extractions did that have any significance?
A. Yes. So there -- the ultimate goal when you seize a device is to actually perform an extraction of the data from that device and there kind of are -- there's a range of outcomes that can happen, but the ultimate goal always in the best case scenario is you're able to extract all the data off a device or the most data you could probably extract, and when a device is powered on you are able to -- your chances of extracting more data you have a higher probability of being able to do that versus when the phone is off. So that's why it was really important for us to keep that phone plugged into a power source, but also keep it in a faraday box to protect it from any potential manipulation.
Q. Was the phone as far as you're aware password protected?
A. Yeah the phone was not in an unlocked state. In other words it was locked.

Q. And does that have any significance based on your knowledge of cell phone forensics?
A. Yes so it's locked you -- unless you know the pass code or if you have a same exact face as somebody, which I've never seen that, you wouldn't be able to get in that phone, and so there are law enforcement tools that we can use to try and get into a locked phone, but those aren't preferable actions versus if someone would provide the pass code to a phone and unlock it voluntarily. If they do that, voluntarily allow you to access that device, it would be for extraction and you would be able to do a full extraction.
Q. Is it possible to turn off the signal to the cell phone?
A. Yes you could put a phone in an airplane mode. I can't recall today if that phone that was seized from Mr. Khalladi investigators were able to put that phone into airplane mode, but my assumption is they were not because they put it in a faraday box or they wanted an extra precaution they put it in there, but I don't recall that particular phone if they did that.
Q. Now after these electronics were transferred to HSI Miami did any of the electronics return to the District of Vermont?
A. Yes. So all of the electronics that were seized

from the search site location ultimately came back to Vermont with the Vermont agents, and we left Miami and traveled back to Vermont on that Friday. So it would have been April 14th. The one device that remained in Miami was the phone that was seized from Mr. Khalladi that I just talked about.

Q. So the items seized from the residence came back to Vermont and the iPhone seized from Mr. Khalladi stayed in Miami?

A. Correct.

Q. And did it remain with the HSI forensic group?

A. It did.

Q. In the powered-on state in the faraday case?

A. Correct.

Q. Now when members of the investigative team returned to the District of Vermont did anyone have any vacations planned?

A. Yeah I believe Paul Altenburg had a vacation planned, I believe you had a vacation planned as well, but certainly Paul did.

Q. And while Special Agent Altenburg was away did you converse with me at all?

A. Yes I did.

Q. And what is your recollection of the subject about which we first conversed?

A. Our conversation revolved around obtaining a search warrant for Mr. Khalladi's phone that was seized pursuant to his arrest.
Q. I'm going to show you now what is marked as the Government's exhibit number 6. Do you recognize this?
A. Yeah this is e-mail chain conversation between myself and you.
Q. And directing your attention to the second page does this reflect the first e-mail that was sent in this chain?
A. Yes. This is on April 25th I'm confirming that we need to get a warrant for that phone.
Q. And how does the conversation generally occur thereafter?
A. You concur and I inform you that I'll start working on it.
Q. And you provide a date on which you will start working on it?
A. I said I would start I think the 25th. This is the same day where I asked you if we should do the warrant, you concur, then I said I'll work on it tomorrow.
Q. And directing your attention to the top of exhibit number 6 what time on the 25th do you indicate that you will begin working on it?
A. It is at 5:37 p.m.

MR. BURRIS: The Government would move to admit exhibit number 6.

THE COURT: Any objection to 6?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 6 admitted]

THE COURT: This is still on the 14th -- are we talking about the 14th of April?

AGENT OSTRUM: No. We're on April 25th.

MR. BURRIS: If I may, Your Honor, just place the exhibit back on the Elmo.

THE COURT: Yeah can you clarify that?

BY MR. BURRIS:

Q. Sir, again could you indicate on what day this discussion occurred?

A. Yeah the warrant was executed on April 12th which was a Wednesday and this is on April 25th is when I asked -- confirmed that we should start working on a warrant for the phone.

THE COURT: Okay.

BY MR. BURRIS:

Q. I'm going to direct your attention now to what is marked as the Government's exhibit number 7. Do you recognize this?

A. Yeah so this is an email I sent also on Tuesday,

April 25th at 5:49 p.m. I'm emailing Nancy Woods who is a criminal analyst at HSI Burlington, Vermont and I'm asking her if she would be willing to go into HSI's case management system, which is called ICM. I'm asking her if she could do me a favor and see if there was an arrest report in the collateral case that the Miami agents would have filed. So I'm starting the process of writing a search warrant affidavit, and I believe some of the information that I would need for that affidavit would appear in an arrest report if one had been written.

Q. And why do you write to Nancy Woods?

A. I have a -- I have a good relationship with Nancy Woods and she can access -- and she works in Burlington, Vermont and she can access -- or I believe she could access through ICM the collateral case file assigned to the Miami agent. So I thought she would be the person that could most quickly get that report to me versus reaching out to the Miami agents who I didn't have -- the HSI Miami agents who I didn't have as good of a relationship.

Q. And do you indicate in this message why you need that information?

A. I specified that I need it for a search warrant.

MR. BURRIS: The Government would move to admit exhibit number 7.

THE COURT: Any objection to 7?

MR. BARTH: No, Your Honor.

THE COURT: All right. So admitted.

[Government exibit 7 admitted]

BY MR. BURRIS:

Q. Sir, I'll direct your attention to what is marked as the Government's exhibit number 8 consisting of two pages. Directing your attention to the second page do you recognize this?

A. Yes. This is an email from myself to Amber Wiseman who is my supervisor at the time. This e-mail is sent also on April 25th shortly after I had the discussion with AUSA Burris, and I'm basically giving her a heads up I'm going to start working on a search warrant affidavit, and I'm doing that because there is an extensive review process within internally to IRS criminal investigation for search warrants and it needs to go through three layers of review, and I always let them know as soon as I know I'm going to need a warrant. You know I let them know in advance because that three level review process can take time and so I'm trying to kind of get ahead of it and expedite the process as quickly as I can.

Q. I'll return to the process in just a moment, but continuing on with exhibit 8 does this -- when does this conversation with Amber Wiseman commence?

A. On April 25th, 2023.
Q. And does it continue on days thereafter?
A. Yeah on April 27, 2023 she asked for an update. The first level -- well I don't need to talk about it at this point, but she asked for an update and I sent her a draft affidavit on April 27th.
Q. And does she indicate what she plans to do with that draft?
A. Yes she informs me she will pass it along to Mark so he can take an initial look at it. Mark -- yeah Mark.
Q. Who is Mark?
A. Mark Mulligan is criminal tax counsel. He's a lawyer that works for IRS. So one of the layers through the process is it needs to be reviewed internally by our counsel before it gets ultimately approved thereafter.
MR. BURRIS: Your Honor, the Government would move to admit exhibit number 8.
THE COURT: Any objection to 8?
MR. BARTH: No objection.
THE COURT: So admitted.
[Government exhibit 8 admitted]
BY MR. BURRIS:
Q. Sir, you mentioned there is a process within IRS CI that you undertake when you are seeking a search warrant. Are you familiar with that process?

A. Yes.
Q. And are you generally familiar with the processes for other federal agencies?
A. Yes.
Q. Is the IRS CI process the same or different than other federal agencies?
A. From my understanding working with agents in other agencies here in Vermont our process is definitely different.
Q. And generally speaking how is it different?
A. In my experience in talking with other agents they simply would write up a search warrant affidavit and submit it to the U.S. Attorney's Office for review prior to being submitted to Chambers for signature. In my case I have to go through a three -- kind of a three layer review process internal within IRS CI before I can send that draft affidavit to the U.S. Attorney's Office, and so that review process is simply that it needs to be reviewed by counsel, from tax counsel, as you just saw that Mark Mulligan. It would then need to go through my supervisor for approval and ultimately approved by the Special Agent in charge, and at that point we proceed with the process of the U.S. Attorney's Office.
MR. BURRIS: May have just a moment, Your Honor?
THE COURT: Yes.

BY MR. BURRIS:
Q. I'm going to direct your attention to what is marked as Government's exhibit number 12 consisting of two pages. Do you recognize this?
A. Yeah this is an email I sent on April 26, 2023 to Andrea Randou who is again one of the assigned collateral agents from Miami, and the nature of the e-mail is me asking for specific information I needed for preparation of the search warrant affidavit.
Q. Fair to say this e-mail was sent the day after you decided to begin preparing the search warrant?
A. Yeah that's correct.
Q. And how did Special Agent Randou respond to your e-mail?
A. Well the e-mail you're showing is not her initial response I don't believe.
Q. We'll get do that in a moment, but just for completeness of this exhibit how does she respond?
A. So she was deferring to Kevin Selent who is the other collateral HSI agent down in Miami. She's referring to him, as she states, he will be better suited to answer the majority of the questions that I pose.
Q. And when does Special Agent Randou respond to your e-mail?
A. On May 3rd, 2023.

MR. BURRIS: The Government would move to admit exhibit number 12.

THE COURT: Any objection to 12?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 12 admitted]

BY MR. BURRIS:

Q. Now directing your attention to what is marked as the Government's exhibit number 13 consisting of two pages do you recognize this?

A. Yeah so this -- this was my initial e-mail to Andrea Randou cc Kevin Selent and my co-case agent in Vermont. That's on April 25th. This is my initial e-mail when I start preparing the affidavit asking for detailed information that they would have in Miami that I needed for the preparation of the search warrant affidavit.

Q. And what is the date on which this e-mail is sent?

A. This is on Tuesday, April 25th. So the day we discussed the warrant.

Q. And did you receive any response to that e-mail?

A. Yes.

Q. Directing your attention to the bottom of the first page in exhibit 13 on what day and time do you receive a response?

A. She responds also on April 25th at 4:22 p.m.

Q. And directing your attention to the second page how does she respond?
A. She -- I can read it. Can you specify which phones you're talking about? There were three taken believed to belong to OT, and then she informs that she's TDY in London until next week and that Kevin is out in Nashville until next week.
Q. What does TDY?
A. It's a temporary duty assignment.
Q. And so she is working in London and Special Agent Selent is working in Tennessee?
A. Yeah I think they -- both of these agents had investigative responsibilities as special agents, but they were also assigned to HSI's equivalent of a SWAT team. I can't remember if they refer to it as TSU or HRT, but it's their SWAT team. So presumably they are doing something related to either investigative responsibilities or in conjunction with their responsibilities as those SWAT team members.
Q. And directing your attention to the first page in exhibit number 13 when do you ultimately receive the information that you had asked for?
A. On May 4, 2023.
MR. BURRIS: The Government would move to admit exhibit number 13.

THE COURT: Any objection to 13?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 13 admitted]

BY MR. BURRIS:

Q. Show you now what is marked as the Government's exhibit number 9. Do you recognize this?

A. Yeah this is an email I sent to you just updating you that I was still waiting on HSI for details about the items that I asked for that I needed for the search warrant.

Q. And do you provide information about when you expect to receive that information?

A. I opine they should be back this week per Andrea.

MR. BURRIS: The Government would move to admit exhibit number 9.

THE COURT: Any objection to 9?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 9 admitted]

BY MR. BURRIS:

Q. Show you now what's marked as exhibit number 11. Do you recognize this?

A. Yes I do.

Q. What do you recognize this to be?

A. I'm confirming with the agents and you that we still have not received the info. This is May 3rd, 2023.

MR. BURRIS: The Government would move to admit exhibit number 11.

THE COURT: Any objection to 11?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 11 admitted]

BY MR. BURRIS:

Q. Now directing your attention to the Government's exhibit number 14 and specifically the first page do you recognize this?

A. Yeah this is an email I sent to Kevin Selent on May 4th. So he finally responds to me I think just before this. He didn't address all of my questions so I reiterated the information -- some of the question that he did not address. So he provided me a response at 11:30 on May 4, 2023.

Q. Now with regard to the information that you are seeking from the agents in Miami could you have asked anyone else for this information?

A. So no. Some of this information was very unique to the agents that effected the arrest of Mr. Khalladi. In particular Kevin Selent was the agent who made contact and visibly saw Mr. Khalladi with the phone as well as

confirming that the phone in his hand had a picture of his daughter. So it was attribution evidence that we -- that I believe we needed to get the warrant finished, and then on May 3rd Andrea deferred to Kevin for a lot of the answers. So it was really clear that Kevin was kind of the person that ultimately needed to provide the answers to me and he got back from his TDY or his assignment in Nashville and provided the answers. So he was the ultimate person who could get me what I did.

MR. BURRIS: Your Honor, the Government would move to admit exhibit number 14.

THE COURT: Any objection to 14?

MR. BARTH: No objection, Your Honor.

THE COURT: So admitted.

[Government exhibit 14 admitted]

BY MR. BURRIS:

Q. Now, sir, during that time do you have an understanding of where Mr. Khalladi was located?

A. My understanding he was being held in Miami.

Q. And when you executed the warrant on April 12th, you mentioned before that he was arrested, do you know whether he was detained or released?

A. He was detained.

Q. And at some point was he ultimately released?

A. He was.

Q. And was he detained pending that release?
A. He was.
Q. I'm going to show you now what is marked as the Government's exhibit number 10. Have you reviewed this document?
A. Yes.
Q. And can you describe what this document is?
A. This is an email from Michael Barnett who is the prosecutor out of the Northern District of New York and he's emailing Sandy Becher who is Mr. Khalladi's defense attorney, and she's asking is Mr. Khalladi still in jail and Mr. Khalladi's attorney responds yes. This is dated May 2, 2023 at 3:07 p.m.
Q. And is it your understanding that Mr. Khalladi was ultimately released later that same day May 2nd?
A. Yes.
MR. BURRIS: The Government would move to admit exhibit number 10.
THE COURT: That's the 2nd or the 7th?
AGENT OSTRUM: May 2nd, 2023.
THE COURT: All right. Any objection to the admission of that document?
MR. BARTH: No, Your Honor.
THE COURT: All right. So admitted.
[Government exhibit 10 admitted]

BY MR. BURRIS:
Q. Showing you now what's marked as exhibit number 15. Do you recognize this?
A. Yeah this is an email from me to you with the -- my co-case agent cc on May 4, 2023, and I am informing you that I finally heard from HSI Miami this morning. See attached search warrant affidavit for your review.
Q. And fair to say that at this point you have now completed a draft of the search warrant for the iPhone that was seized from Mr. Khalladi's person?
A. Yeah I would say that a draft was completed, you know, before the date on April 27th, but this was kind of a complete draft that ultimately would be somewhat similar to the draft that ultimately would be swearing out. So it was as close to a final copy as I have at that point.
Q. And with regard to the difference between the draft you completed on April 27th and the draft that you include in this particular e-mail is it fair to say that the only difference is the addition -- or the primary difference is the addition of the information that you received from HSI Miami?
A. Yeah although, you know, minimal in sentences what I deemed to be critical in actually submitting the search warrant affidavit for signature. So this information in this draft now reflects what I got from Kevin Selent.

MR. BURRIS: The Government would move to admit Government exhibit 15.

THE COURT: Any objection to exhibit 15?

MR. BARTH: No.

THE COURT: All right. So admitted.

[Government exhibit 15 admitted]

BY MR. BURRIS:

Q. Now, sir, when you completed the draft on April 27th was this a warrant to be sought in the District of Vermont or the Southern District of Florida?

A. At the time I had it written up it was a draft to be sought in the District of Vermont.

Q. And around the time of your final draft including the HSI Miami info was there some discussion about the venue for the warrant?

A. Yeah this discussion ensued whether to proceed with getting the warrant in Vermont or obtaining the warrant in Florida.

Q. And was there any reason why you continued to complete maybe a draft of the warrant which would be obtained in the District of Vermont?

A. Between the initial time period and when we ultimately decided?

Q. Well let's take those one by one. Initially why was it drafted to be a Vermont warrant?

A. I don't know that I recall. I think likely it was because that was just how I had it written up. I don't think that there was -- I don't think on April 27th -- put it this way. On April 27th I didn't know where we would be ultimately swearing that warrant out. I think the draft I had, the letterhead District of Vermont, that's where it started.

Q. Now with regard to the more complete draft was there a more -- was there a different reason why the warrant remained a Vermont warrant?

A. Yeah I had a conversation with you and we -- basically we made a decision that we were going to pursue that warrant in the District of Vermont.

Q. And was there a reason why that decision was made?

A. Yeah at the time we believed that based on -- we believed we could get that warrant sworn out sooner in the District of Vermont than we could in Florida, and partly that was based on the Agent's responsiveness down in Florida, but also the process we had just gone through in swearing out the residential warrant which was more burdensome than we thought it would be, and so we believed that the quickest approach to getting a warrant signed would be to pursue the warrant in the District of Vermont than in Florida.

Q. I'm going to show you now what is marked as the

Government's exhibit number 16 consisting of three pages. Directing your attention to the bottom of the second page do you recognize this?
A. Yes. This is an email I sent to Paul Altenburg and Chris Pike informing them that I just got off the phone with you and that the preference is to swear the Khalladi phone warrant in the District of Vermont, and I'm asking them what -- kind of coordinating -- kind of reaching the topic of logistics and how we might get that phone to Vermont, and I opine that my thought is we ship it overnight to HSI Burlington with a portable charger attached and I'm basically deferring to them for concurrence, and this is sent on May 4th. This is the day Kevin got me the information.
Q. And do you indicate why there's a preference not to swear out the warrant in Miami?
A. Yeah I say preference is not to swear it out in Miami as it's more of a process. I didn't go into extreme detail on that, but they understood based on what had occurred, you know, just prior to the search warrant execution on April 12th.
Q. And fair to say you were referring to the process undertaken to obtain the residential search warrant in the District of Miami?
A. That's correct.

Q. Now just briefly with regard to the reference to the portable charger again could you explain why that's significant?
A. Yeah so again the phone was in a powered-on state when it was seized from Mr. Khalladi. That is very -- it's very important to keep that phone in a powered-on state for future extraction purposes, and so by this time the phone is still in the faraday box, it is still powered on plugged in, and it is important that if that phone is removed from the faraday box it's put in a faraday bag and it's plugged into some sort of power source when it's being shipped because we don't -- you don't know the status of someone else's phone. So it could have kind of a crummy battery and it could die relatively quickly or maybe it's a great battery and it lasts for days, but either way you don't want to take the risk. So you would presumably get it plugged into a power source when it is being shipped and that way you would not have to deal with a phone that's dead upon arrival.
Q. Again when was this e-mail sent?
A. May 4, 2023.
Q. Can you describe the ensuing emails in the chain starting with the next -- the date of the next e-mail?
A. So the following day Paul Altenburg from HSI is sending an email to Kevin Selent. Again Kevin is down in

Miami, he's the Miami Agent, and he's asking to ship the phone up to Vermont.

Q. And just directing your attention to the ensuing page and content of that e-mail does Special Agent Altenburg indicate why the phone needs to be in Vermont?

A. Yeah he asks them to please overnight Mr. Khalladi's phone on Monday so that we could execute our search warrant. So he's providing them the added support to ship it. We're trying to give them all the information so they can just literally take the phone, put in a faraday bag, put it in a power source, and mail it.

Q. Then directing your attention to the next message in this chain when is that message sent?

A. So Kevin responds to Paul Altenburg on Friday, May 5th approximately 3:22 and asks him to send the faraday bag.

Q. Rather than the Miami agents shipping the phone fair to say Vermont agents have to first mail a faraday bag from Vermont to Miami so that the phone could be sent in a faraday bag back to Vermont?

A. Yeah they did not have a faraday bag so they needed one and so they asked us to send them one. You need to mail the phone in a faraday bag so it's critical. This is a critical part in the shipping process.

Q. And just lastly could you describe the last

messages in this chain?
A. Paul then on May 5th at 4:07 p.m. asks Chris Pike, who is our other co-case agent, if he can send HSI Miami a faraday bag and Chris responds also on Friday, May 3rd at approximately 4:20 that he can get it out. It's no problem.
MR. BURRIS: The Government would move to admit exhibit number 16.
THE COURT: Any objection to 16?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Goverment exhibit 16 admitted]
BY MR. BURRIS:
Q. I'm going to show you now exhibit number 17. Do you recognize this?
A. Yeah this is an email I sent to my supervisor on May 4, 2023 after receiving the information from Kevin Selent, and I'm formally requesting approval to execute the search warrant on Mr. Khalladi's phone and I have attached all the supporting documentation I need for approval including a concurrence memo from our internal tax counsel Mark Mulligan.
Q. Again this is a necessary step in the process that you just described for obtaining warrants as an IRS CI Agent?

A. Yeah that's correct. I'm also giving her kind of a heads up that I was hoping on May 4th that we would be swearing out next week. So I'm giving her that heads up so she can elevate the paperwork in a timely fashion to the Special Agent in charge.

MR. BURRIS: The Government moves to admit exhibit number 17.

THE COURT: Any objection to 17?

MR. BARTH: No, Your Honor.

THE COURT: All right. So admitted.

[Government exhibit 17 admitted]

BY MR. BURRIS:

Q. Show you now Government's exhibit number 18. Do you recognize this?

A. I do.

Q. And what do you recognize this to be?

A. So the previous Friday was when Mr. Pike was going to send the faraday bag to Miami. This is the following Tuesday and I'm basically getting status update on where -- did we ship the faraday bag, and on May 9 -- Tuesday, May 9, 2023 at 4:43 I wrote an email to you as well as co-case agents that Chris sent the faraday bag yesterday. So that would have been Monday.

Q. Fair to say that's one business day after being asked to send the faraday bag?

A. Right. That's correct.

MR. BURRIS: The Government would move to admit exhibit 18.

THE COURT: Any objection to 18?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 18 admitted]

BY MR. BURRIS:

Q. Showing you now what is marked as the Government's exhibit 19. Do you recognize this?

A. Yeah this is an email I sent to Chris Pike. Chris was the one, again, who mailed the faraday bag to HSI Miami. This is sent on Monday, May 15, 2023 and I'm asking Chris whether there's any update on the phone coming from Miami, did they ship the phone.

Q. And did you receive a response to that e-mail?

A. Yes. He replies the same day he just got off the phone with Kevin Selent in Miami and that the phone is going to be shipped that day.

MR. BURRIS: Government moves to admit number 19.

THE COURT: Any objection to 19?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 19 admitted]

BY MR. BURRIS:

Q. Showing you now what is marked as the Government's exhibit number 20. Do you recognize this?

A. Yeah this is a discussion between myself and you and we're starting to plan for when we would be able to swear out the warrant. The -- this is Monday, May 15th. So the phone was being shipped that day from Miami and I'm kind of giving you some tentative days I'll be available assuming the warrant or the phone arrived, you know, after Tuesday/Wednesday time period.

Q. And what do you write in the first sentence of your first message?

A. I assume tomorrow is a no go for swearing out the warrant.

Q. Why would you assume that the warrant couldn't be sworn out at this point?

A. Because Kevin Selent in Miami informed Chris Pike that he was sending the phone on Monday. So the same day. So I did not think that the phone would arrive in district on Tuesday, May 16th. That was my assumption at that time. Oh excuse me. The other reason was we needed to get a draft to or a copy to Chambers for Chambers review of the warrant. Generally we're required to give 24 hours notice. So I think part of my calculus was also if the warrant arrived on the 16th, we would likely get him a

draft on that day which we wouldn't be able to swear out until Wednesday. So I'm speculating a little bit in this e-mail I think.

Q. You mentioned 24 hours. Can you just explain a little further the significance of this 24 hour time period?

A. Well can you reword it?

Q. You mentioned that there would be a 24 hour time period between when the warrant was provided to the Magistrate Judge and when it was signed out. Can you describe why there would be a 24 hour delay?

A. It's my understanding the Magistrate Judge likes to have a copy of the Agent's affidavit within 24 hours of the scheduled appointment to actually swear out the warrant so he has time to familiarize himself with the Agent's affidavit.

Q. Now directing your attention to the third paragraph in your first response fair to say you indicate some times when you are available and unavailable?

A. Yeah I'm giving you some preferred times that would fit my schedule in those -- in those ensuing paragraphs.

Q. And this message is sent on May 15th?

A. Yes it is.

Q. And you indicated that the following day, the 16th, was likely not a possible day for swearing out the

warrant?
A. Correct.
Q. The next day would be the 17th, but you don't indicate that you are available on that day. Why not?
A. So the 17th was a very -- it was -- I had a conflict on the 17th. The RCI office got flooded with a tremendous amount of water some months prior to that due to a burst pipe and we needed to move all of the evidence in our Grand Jury room on that day to -- from one location to another, and that day was in the books for a long time and it was a very important date as I was getting extreme pressure to hold up my end of the bargain to move the evidence. I am the -- one of two special agents for IRS CI in the state and I have ultimate responsibility over my office. So that date was important to make sure we got the Grand Jury material out from one location into another so contractors could move into the space. So that's what I had on May 17th.
MR. BURRIS: The Government moves to admit exhibit number 20.
THE COURT: Any objection to 20?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government exhibit 20 admitted]
BY MR. BURRIS:

Q. Final e-mail, sir, showing you what is marked as exhibit number 20 (sic). Do you recognize this?
A. Yes I do.
Q. And can you describe what is depicted here?
A. Yeah the e-mail at the bottom is an email sent from Special Agent Paul Altenburg on Monday, May 18th and it's being sent to Kevin Selent and Andrea Randou, the Miami agents, and he's thanking them for sending a phone and he's asking for a tracking number so we can ensure we know when it's landed in Vermont.
MR. BURRIS: The Government moves to admit exhibit number 21.
THE COURT: Any objection to 21?
MR. BARTH: No, Your Honor.
THE COURT: So admitted.
[Government exhibit 21 admitted]
BY MR. BURRIS:
Q. Now do you have an understanding of when the phone ultimately arrived in the District of Vermont?
A. Yes. I found out on May 17th that it arrived the prior day on May 16th. So it landed in Vermont May 16th. I learned of this on May 17th.
Q. And on what day was the completed warrant affidavit -- application and affidavit submitted to the Magistrate Judge?

A. It was submitted -- it would have been submitted the day -- it would have been submitted on May 17, 2023. So the day I learned that it landed in Vermont it was submitted to Chambers.

Q. Show you now what is marked as Government's exhibit number 3. Do you recognize this?

A. Yeah this is the signed search warrant for Mr. Khalladi's phone and it was signed on May 18, 2023.

Q. And directing your attention to the bottom is that the date indicated on the first page of this exhibit?

A. It is.

Q. And just to be sure this is the warrant related to the cell phone that was seized from Mr. Khalladi's person in Miami, Florida?

A. Correct.

MR. BURRIS: The Government moves to admit exhibit number 3.

THE COURT: Any objection?

MR. BARTH: No, Your Honor.

THE COURT: So admitted.

[Government exhibit 3 admitted]

BY MR. BURRIS:

Q. Now, sir, before you obtained the warrant for Mr. Khalladi's iPhone that is the subject of exhibit number 3 at any point did Mr. Khalladi request the return of the

phone?
A. No he did not.
Q. As of the date of this hearing today have you received any request for the return of the iPhone?
A. I have not received any request from Mr. Khalladi.
MR. BURRIS: May have just a moment, Your Honor?
THE COURT: Yes.
MR. BURRIS: Nothing further from the Government, Your Honor.
THE COURT: All right. We've been going for an hour and a half. I'm wondering what the schedule is for your witness. You had an additional witness; is that right?
MR. BURRIS: This is the Government's sole witness, Your Honor.
THE COURT: Oh this is the sole witness. Okay, and does the defense have any witnesses?
MR. BARTH: No, Your Honor.
THE COURT: Okay and how long do you anticipate your cross?
MR. BARTH: About 45 minutes.
THE COURT: All right. Let's take about a 10 minute recess because I need to reschedule some conflict of cases. So, all right, so let's be back in 10 minutes.
(Recess.)

THE COURT: Okay, Mr. Barth.

MR. BARTH: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. BARTH:

Q. Good afternoon, Agent Ostrum.

A. Good afternoon.

Q. It's fair to say, sir, that you are not an expert when it comes to the forensic analysis of a cell phone; is that right?

A. Right.

Q. Fair to say you're not an expert when it comes to the preservation of data on a phone that's been seized?

A. Right.

Q. And fair to say that you're not an expert on the extraction of data from a phone that's been seized?

A. Correct.

Q. I would like to direct your attention to defense exhibit J, and for Your Honor's understanding I've left a copy of our exhibits in front of the witness so I don't have to go back and forth. The Court should have exhibits as well. Sir, defense exhibit J let me know when you have it in front of you.

A. Yes I have it in front of me.

Q. And you recognize that, sir, correct? It's the conditions of release for Mr. Khalladi from the Northern

District of New York?
A. Yeah that's correct.
Q. I think even the Government admitted it and you identified it, correct?
A. Correct.
THE COURT: Sorry. The Government admitted it?
MR. BARTH: I don't recall, Your Honor, which exhibit it was. Just so Your Honor knows we both came up with separate exhibits, the Government and defense. They overlap, but my questioning is keyed off my exhibits so I'm primarily going to be referring to those.
BY MR. BARTH:
Q. I want to draw your attention, sir, to the second page of the exhibit and in particular about two-thirds of the way down the sheet there is a condition U which directs somebody participate in a form of electronic monitoring. Do you see that condition?
A. Yes.
Q. In any electronic monitoring for the purposes of potentially a curfew, home detention, or home incarceration. Do you see that, sir?
A. Yes in the subparagraphs, yup.
Q. That's exactly right. Subparagraph UI, UII, and UIII. None of those boxes are marked, correct?
A. Correct.

Q. In other words, Mr. Khalladi in the Northern District of New York -- the conditions that were set I should say in the Northern District of New York did not prohibit him from leaving his home, correct?
A. Correct.
Q. And in fact it's not unusual for people who may reside at a particular place to leave their home during the day to run chores or go to work or a whole variety of things, correct?
A. Correct.
Q. Also fair to say, sir, that neither the Northern District of New York, which I think really is the primary jurisdiction we would be concerned with at this time, there was never any violation report that was issued, correct?
A. I'm not aware of any.
Q. In other words, Mr. Khalladi's pretrial conditions were not -- nobody alleged he violated his conditions by not residing at a particular residence, correct?
A. Yeah not that I'm aware of.
Q. I want to talk to you a little bit about David Green. Can you tell me, sir, at the time you interviewed Mr. Green were you aware of whether he had any criminal history?
A. Kind of a complicated answer. At the time we had

identified that there was a David Green living in the -- in Mr. Khalladi's residence prior to the execution of the search warrant and we believed that that person David Green had a criminal history. The day after the warrant when we executed we discovered that the David Green that was living in Mr. Khalladi's residence was not the David Green we thought it was. So the David Green we actually encountered I do not recall if he had a criminal history, but I believe the day of the warrant we checked -- my memory is that we looked at his criminal history and it did not match the David Green's criminal history that we thought had been living there so we got our David Greens mixed up.

So I guess my answer to your question is I don't recall if the David Green we encountered the day of the warrant had a criminal history. My memory is maybe he got in trouble for some marijuana at one point in time. That's my memory.

Q. Okay. You recall that in the warrant to search the residence it indicated that the individual who was living with Mr. Khalladi had a criminal history. Do you recall that, sir?

A. I missed the first part.

Q. Yes the warrant which issued for the search of the 805 South Miami residence within it in the application or

the affidavit it indicated that the roommate of Mr. Khalladi had a criminal history. Do you recall that?
A. I do recall that.
Q. And in fact -- I can direct you to it if need be, but in that warrant it states that his co-tenant, excuse me, was awaiting sentencing in the District of Maryland for mail fraud involving a scheme where elderly victims were told a relative, typically a grandchild, needed money for bail, legal fees, or other expenses, and in that application where it describes that, that was talking about David Green, correct?
A. Right. I remember that.
Q. And is it still your belief despite the similarities between what was attributed to David Green and the -- and, Your Honor, just so you're aware I'm going to direct your attention to defense exhibit L and of course if the witness wants to look at that exhibit as well it's exhibit L, and in particular Bates 1755.17. Do you see that, sir?
A. Yes.
Q. And it's in particular note 8 at the bottom of the page.
A. Yes.
Q. And you're familiar with this warrant?
A. Yes.

MR. BARTH: And, Your Honor, I would move this warrant into evidence. I believe it probably already is in evidence based on the Government's admission, but out of a abundance of caution --

THE COURT: All right. So the page is 1755.01.

MR. BARTH: 17, Your Honor, but I would move the entire exhibit L.

THE COURT: Okay. Any objection?

MR. BURRIS: No, Your Honor, I believe it is already in evidence.

THE COURT: All right. So admitted.

[Defense exhibit L admitted]

BY MR. BARTH:

Q. And so in that footnote 8 that we were just discussing, sir, fair to say that footnote was describing the individual David Green?

A. Yeah I think it was describing the individual David Green that we believed to be living with Khalladi at the time.

Q. Right and you would agree it's quite a coincidence that the same scam that you're investigating with regard to Mr. Khalladi a David Green committed in Maryland but not the guy that's living with Mr. Khalladi?

A. Can you repeat your question?

Q. In other words, what's described in footnote 8 is a

grandparent scam, correct?
A. Correct.
Q. And you are investigating Mr. Khalladi for a grandparent scam?
A. Yes. Correct.
Q. And the individual described in footnote 8's name is David Green?
A. Correct.
Q. And an individual living with Mr. Khalladi is named David Green?
A. Right.
Q. Bit of a coincidence?
A. I mean at the time my recollection is that we -- footnote 8 was our belief at the time. Gentleman's name was David Green and we thought that the David Green alluded to in this footnote had this particular criminal history. So I guess it was a coincidence the fact at that time we both believed that Mr. Khalladi and Mr. David Green were alleged to have committed the same type of crime if that's to answer your question.
THE COURT: So since -- have you learned since that this is inaccurate that the David Green -- well it's a different David Green obviously who was there at the time of the execution of the warrant, but was there a David Green who was charged with this particular criminal

offense in Maryland?

MR. OSTRUM: Yeah there was. So my memory, again I didn't write this search warrant affidavit that we're looking at right now and I didn't do the research into this David Green that we're alluding to in footnote 8, my memory of the events is that at this point in time when this was sworn out we believed the David Green living with Mr. Khalladi had this criminal history. What occurred was the day of the execution of the residential search warrant we encountered David Green, but when I found through talking with David Green that he was not the David Green we thought he was, it was a coincidence, and I actually in my -- I believe in my search warrant for Mr. Khalladi's phone, the one that we're talking about today, I believe I correct this paragraph -- subparagraph.

Q. You did.

A. Okay.

Q. There was at least a notation which tried to explain it.

THE COURT: But is there David Green who in fact is charged in the District of Maryland with this kind of offense?

AGENT OSTRUM: There is and I don't know what the mix-up was because I wasn't the one who did the research for this initial affidavit so I don't know why

there was mix-up, but there was. Certainly they share the same name.

THE COURT: Okay.

BY MR. BARTH:

Q. Thank you. Staying on the topic of Mr. Green -- well you interviewed him. He told you that he rarely saw Mr. Khalladi at the apartment, correct?

A. Yeah I don't remember his exact wording, but it was something to that effect.

Q. But it is also true, is it not, that he confirmed that this was Mr. Khalladi's residence?

A. Yeah he basically -- yes.

Q. I also want to ask you again about the search warrant we were just discussing. Just bear with me one second. If you were to go back to page 1755.17 in exhibit L, I think you probably were just there a moment ago, this again is the search warrant application for the 805 South Miami residence?

A. Correct.

Q. And if you go to page 17 there's a description of an interview with one of the managers of that particular building. If you look at paragraph 19 there's discussion of a property manager?

A. Correct.

Q. And this warrant was sworn out on April 10th of

2023, correct?
A. I think it was sworn out -- let me check. It looks like it was sworn on the 11th.
Q. Okay. The 11th, excuse me, and so this was at that time fairly recent data points that the agents were collecting from the property manager, correct?
A. Correct.
Q. And the property manager told one of the agents, I believe it was Special Agent Selent, that as far as April 5th was concerned Khalladi had scanned his fingerprints to gain access to the elevator in the building approximately 11 times. Do you see that?
A. Yes.
Q. And on April 6th he had scanned his fingerprints to get into the building on approximately six occasions?
A. Correct.
Q. Were you present, sir, when Mr. Khalladi was arrested?
A. I was present in the fact that I was outside the building, but I was not inside the unit when he was encountered. So I would say no I wasn't present in the unit. I didn't watch him -- I didn't watch the agents effect his arrest.
Q. Okay. So you were sort of at the site at the address, but you didn't go into the particular apartment

to watch the arrest?
A. Yeah I can explain if you like.
Q. Sure. Go ahead.
A. Sure. After when we drove over to the other location where Mr. Khalladi was encountered I was -- there was at least two cars. I was in one car with David Green and I stayed -- I stayed with Mr. Green while the other agents went upstairs to the apartment where Mr. Khalladi was encountered. So that's where I was during the time they made his arrest.
Q. Okay. Did you see them bring Mr. Khalladi down?
A. I believe I watched him, yeah, leave the building into the other car.
Q. Okay, and afterwards did you return Mr. Green to his apartment?
A. Yes.
Q. And thereafter did you speak with any of the agents who effectuated the arrest?
A. Yeah I would have.
Q. Sort of debrief, right, which is not unusual?
A. Yeah we would -- yeah we would have had some sort of debrief. I don't recall a formal debrief, but I'm sure we talked about what had unfolded that day.
Q. Including what had unfolded at the time of arrest?
A. Yeah I mean I don't recall the exact details, but I

think it -- it was a very chaotic morning because we did not know where Mr. Khalladi was and so it was very hectic from my perspective trying to locate him, and so I think the emphasis on what was discussed was that basically we found him which was a major concern when you're in a major city and you can't find the person you're trying to make an arrest of.

Q. I want to direct your attention again to defense exhibit L. Now this exhibit, the search warrant for the apartment, it was sworn out on the 11th and the Honorable Lisette Reid signed off on the warrant on April 11th, the same day, correct?

A. Correct.

Q. And this was a warrant from the Southern District of Florida. In other words, Lisette Reid, Magistrate Judge in the Southern District of Florida, correct?

A. Correct.

Q. However, the individual who sworn out the -- or excuse me -- who put the application together and was part of the swearing out of the warrant was Agent Altenburg from the District of Vermont, correct?

A. Correct.

Q. That warrant included that any electronic storage device including phones found in the apartment could be seized and searched; is that correct?

A. Correct.
Q. And so just to sum up one of the agents, Agent Altenburg, who you have been working with, have you not?
A. Yes. Correct.
Q. He submitted this warrant to the judge on the 11th, the judge signed off on it on the 11th of April of 2023, and it included the ability to search or seize and search phones found in the apartment, correct?
A. Yeah I would just say I don't actually know when this package was submitted to the judge, whether it was on the 11th or it was the day before or two days. I have no idea. I wasn't involved in that. It was signed by Special Agent Altenburg on the 11th. That I can read from the cover.
Q. And you can see that the judge signed it on the same day?
A. Right. Right.
Q. And so it's fair to say that in the investigation of Mr. Khalladi you were successful in getting a warrant which included phones out of the Southern District of Florida?
A. Correct.
Q. And the only reason why you required to get a new warrant was because the phone that was seized from Mr. Khalladi was not seized from the residence described in

defense exhibit L correct?
A. Correct.
Q. It's fair to say, is it not, that in order to get a warrant for the phone that was --
A. Excuse me.
Q. No problem. It's fair to say, is it not, that to have obtained a warrant for the phone that was seized from Mr. Khalladi's person, the one that was is the subject of the motion to suppress today, you would not have had to add much to the application that already went in front of the Honorable Lisette Reid?
A. I apologize. I think I know what you asked, but I want to make sure. I started coughing, but do you mind repeating it for me?
Q. Not at all. It's fair to say, is it not, to have -- it wouldn't have required much more in the way of information in an application to get a warrant to search the phone of Mr. Khalladi's that was seized at the alternate location?
A. Yeah I would agree we had what we needed to get the warrant.
Q. Correct. In other words, had you made the choice to get a warrant say on the 12th or the 13th for the phone it would not have required much more than talking to Agent Selent, correct?

A. Correct.
Q. That phone, I think it's pretty clear from the record but I'll make sure, was seized on April 12th of 2023. Ultimately I believe the warrant that you swore out here in the District of Vermont was on May 17th and the Judge signed off on it May 18th. Does that sound right to you?
A. That sounds right.
Q. Now, sir, you are familiar with the case of the U.S. v. Hollands; is that right?
A. What was the case?
Q. The case of United States versus Hollands?
A. Oh yes.
Q. And in fact if you turn to exhibit F in the package of materials I left for you, you will see a warrant and warrant application there. Let me know when you find it.
A. Yeah I found it.
Q. Great. You see your name on that warrant application, do you not, sir?
A. Correct.
Q. And this is a warrant that you submitted to Judge Doyle back in October of 2022 to search three phones associated with the case of U.S. v. Holland?
A. Correct.
Q. Now that warrant was signed off on, the Judge did

grant the warrant, correct?
A. Correct.
Q. If you turn to the very last page of that warrant application you will see an addendum to the search warrant, do you not?
A. Yeah I do.
Q. And you're familiar with that addendum, sir?
A. Yeah I've reviewed it since.
MR. BARTH: Your Honor, I'm going to move to admit defense exhibit F.
THE COURT: All right. Any objection to F?
MR. BURRIS: No, Your Honor.
THE COURT: All right. So admitted.
[Defense exhibit F admitted]
BY MR. BARTH:
Q. So looking at the addendum to the search warrant you will see that it notes to the extent -- are you on the addendum? I should make sure first.
A. Yes I have it in front of me.
Q. And I'm reading from the final paragraph on that page of the exhibit. To the extent that United States versus Smith 967 F 3rd 198 Second Circuit 2020 may be relevant to this application for a search warrant, the undersigned has determined that the matter is more appropriately considered by the presiding District Judge.

Do you see that, sir?
A. I do.
Q. And you understood what that meant, correct? It meant that the Judge was indicating that the warrant that you had submitted in this case might not be timely, correct?
A. Yeah I think at the time this was probably new information for me for the information I would need certainly a refresher on. So I understand now much better than then.
Q. Sure, but when you saw this at the time back in October of 2022 maybe you didn't know what it meant exactly, but you were either told or you educated yourself about what this meant, correct?
A. Yeah after this, yup.
Q. Did you have discussions with attorneys with the U.S. Attorney's Office about what this meant?
A. Yeah I believe it was a matter of brief discussion with the Assistant United State's Attorney Greg Waples who was the AUSA on call in this case.
Q. And he explained to you the import of this notation in the addendum?
A. I think he more pointed out that this could be an issue in this particular case due to the unique circumstances.

Q. It's fair to say after seeing this addendum you were on notice that when seizing property that such as a cell phone that you wish to search that getting a warrant needs to be a priority?
A. Yes. Yes that's fair.
Q. Okay, and also fair to say, sir, that as a result of the Smith issue the evidence derived from this warrant was suppressed in the Hollands case?
A. Right.
MR. BARTH: And, Your Honor, we have provided you with an exhibit which is the order from Judge Crawford and it's defense exhibit H and we would ask the Court take judicial notice of it.
THE COURT: Okay.
BY MR. BARTH:
Q. Now we've seen in the emails that you went through with Government counsel that warrant was not requested in the Southern District of Florida?
A. Correct.
Q. In fact, if you turn to exhibit A, defense exhibit A, you'll see one of the emails that you and Government counsel went over?
A. We're talking about the phone warrant, just so we're on the same page, for Mr. Khalladi's person that he was arrested, correct?

Q. That is correct. Yes. Thank you for clarifying, and you'll see this e-mail in defense exhibit A -- and I'll go ahead and move to admit it. Again I think it's already been admitted but --

THE COURT: All right. So is there any objection?

MR. BURRIS: No, Your Honor.

THE COURT: So admitted.

[Defense exhibit A admitted]

BY MR. BARTH:

Q. You will see on the second page of this you are e-mailing with Mr. Burris and you state on a separate note do we need to get a search warrant for Khalladi's phone. It was taken from him incident to arrest in the girlfriend's house not at the search warrant location. Just wanted to flag this just in case it was an issue. Do you see that, sir,

A. Yes.

Q. And that's -- you're asking him about this because you are unsure whether you need a warrant or not?

A. No, no, that's not correct.

Q. No it's not. When you said -- all right. I'll move on. In any event the e-mail that you send to Mr. Burris is responded to with yes we must get a warrant?

A. Yeah. Need me to clarify what I meant by the first

one? Up to you.
Q. Yes. Go ahead.
A. Okay. I'm basically confirming that we need to proceed with the warrant. I'm -- in a way that's not -- that's not meant to be -- I don't know the word I would use -- not a know it all. So I'm confirming we should proceed with the warrant and I know we need to get a warrant because I'm bringing it up to him. I'm seeking confirmation we should probably get going on it was my thought at the time and I was trying to work in a way to state to the U.S. Attorney come across in a certain tone.
Q. So it was your understanding that you did need a warrant for the phone that was seized from Mr. Khalladi's person and you were trying to sort of gently inform the AUSA Mr. Burris that you were going to need to do this?
A. Yeah I think we had discussed -- I think the topic of getting a warrant had been discussed. There were certain other factors leading up to that that delayed that process, but at this point I deemed it maybe we should -- it would be smart to get going on.
Q. Okay.
THE COURT: Is this a topic that you might not want to address?
MR. BARTH: We're moving on.
THE COURT: Okay. By the way know it all from

an IRS Agent to a U.S. Attorney that's an interesting concept.

AGENT OSTRUM: What was that?

THE COURT: You being a know it all -- concerned about being a know it all I find that --

AGENT OSTRUM: I couldn't find a better word but my vocabulary isn't very expansive.

THE COURT: Right.

BY MR. BARTH:

Q. Sir, I'll direct you to defense exhibit M and again this -- we'll move to admit this, Your Honor, but I think it's already been admitted.

THE COURT: Okay. Any objection to M just in case it's not admitted?

MR. BURRIS: No objection.

THE COURT: So admitted.

[Defense exhibit M admitted]

BY MR. BARTH:

Q. And we talked a few minutes ago about how getting a followup warrant for the phone that was seized from Mr. Khalladi's person would not have required much. That in fact it would have required you to talk to Agent Selent and not much more, and in fact in this e-mail you sort of note that when you say this should be a straightforward process. Do you see that?

A. Yeah can I explain?
Q. You may.
A. Because the IRS CI review process is a cumbersome one due to the levels of review I wrote my emails to my supervisor concerning warrants in a particular way and I'm basically trying to convince them, and I would do this even with likely a very complicated warrant that it will be quick, you know, I'm doing that so they prioritize it and review it quickly, and so I say this burdensome process Mark Mulligan, who I know quite well, it will take him much longer to prioritize that review of that warrant, and so I am wording this in a way where he can look at it and say it will be easy I'll get it out.
THE COURT: So did you word this application in such a way as to expedite the review process?
AGENT OSTRUM: So at the time I submitted this, this is April 25th, it was a draft affidavit because I was missing critical information from Kevin Selent, but, you know, it's not a very long affidavit so I'm basically flagging and using words to expedite. I would have told my supervisor we need this soon which is why just two days later she's asking me where is the affidavit. So I would have had that conversation with her on the phone that it would have been a priority.
BY MR. BARTH:

Q. Directing your attention to defense exhibit E, if you wouldn't mind, this was your opening request from your colleagues in the Southern District of Florida to get you information, correct? You can see on the last page there's an email from you on Tuesday, April 25th to Andrea Randou and that was you deciding that we were going to draft a warrant and you needed some additional information?

A. Yeah that's correct.

MR. BARTH: And, Judge, I would ask that exhibit E be entered into evidence.

MR. BURRIS: No objection, Your Honor.

THE COURT: All right. So admitted.

[Defense exhibit E admitted]

BY MR. BARTH:

Q. Now fair to say that you didn't get an answer immediately, correct?

A. Yeah she's -- she's giving me reasons that they are gone and then she's asking clarification. Yeah she's not answering questions.

Q. Okay, and do you recall when you got answers to your questions?

A. Yeah I believe ultimately May 4th which is when they got back from their assignments in London and Nashville.

Q. So from the time you asked some -- would you agree the questions you asked were fairly basic?
A. Yeah I felt -- I would agree they were fairly basic.
Q. And from the time you asked on April 25th you didn't get answers to your questions until May 4th; is that right?
A. Yeah. I would just point out that on the following day April 26th I submitted a more detailed e-mail stating what we needed, and some of what I listed although maybe straightforward would not be straightforward depending on logistics. So it's the agent that has to answer. They were busy in another state they wouldn't be able to comply with all my questions. So although they -- some of them were straightforward, you would need to know the context if that makes sense.
THE COURT: Let me just follow up just a bit. I mean you're in contact with the two collateral agents.
AGENT OSTRUM: Correct.
THE COURT: Right and they are both -- one is in London and one is in Nashville. Is there a reason why you would not have gone to any other agents in Southern District of Florida to get the answers to the questions that you have?
AGENT OSTRUM: I think I asked several questions

and this is the e-mail -- probably better e-mail to refer to, to point to, to show you the different types of questions. Some of those questions dealt solely with what Kevin Selent observed, and also some of my questions to Kevin were directed towards them doing some physical things like taking photos from the phone and such. So some of those things presumably could have been done by other agents. Some of them would not have been, but this was kind of their house. They were busy. So I'm kind of -- I pressed them. I asked them on the 25th and I'm pressing them on the 26th and they are deferring. So I never reached out to another agent -- IRS Special Agent in Miami to facilitate some of the answers to my questions.

THE COURT: And that was because some of the answers to the questions would have required the personal knowledge of these two collateral agents?

AGENT OSTRUM: At the time I thought -- yeah at the time I thought one or both could answer. Andrea Randou confirms on May 3rd that she defers to Kevin actually. So Kevin appeared to be the ultimate question person that was -- that had all of the knowledge or at least knowledge to some of the questions.

BY MR. BARTH:

Q. But it's fair to say that other agents could have answered this question, right? Like we talked about there

were some basic questions like had the phone been extracted? Agent Selent was not the only agent who had the answer to that question?
A. That I don't know because I'm not a HSI Special Agent so I don't know their process down in Miami. It's possible that one collateral lead case agent could have -- you know he might be knowledgeable of that whole process. So I don't know. I can't give you an answer to that.
Q. So you don't know one way or the other?
A. No I don't know which is why I was asking -- you can see in my email this is where I was asking him because I don't know the answers to these questions.
Q. And it's also fair to say in your emails that to any of the HSI agents down in Florida that you never asked whether there was somebody else that could answer your questions while he was out on a TDY?
A. Yeah I don't recall asking other agents. They -- I sent my two initial emails and the second was quite lengthy and to the point. I was hoping I would get a response. They didn't respond to that and they made it clear that they were on TDY. I was -- you know at the time I understood that they worked for HSI SWAT team so I didn't want to presume that they had time to do it, and so what I took was they were going to do it as soon as they could, and I think she even says that later on is that

they wanted to get us an answer and we'll get it soon. I can't remember the e-mail.
Q. But obviously, sir, they didn't get them to you soon. It was well over a week before you got a response, correct?
A. Yeah it took April 25th, 26th I posed the questions. I get back the bulk of the information on May 4th.
Q. And you yourself have been on TDY, correct?
A. I don't believe I have. I've attended trainings in other areas and things like that, but I don't believe I've been assigned. So no I don't think so.
Q. Well fair to say that you have had experience in engaging in your job outside the District of Vermont. For instance, you were in Miami, Florida?
A. Right.
Q. And you were down there for several days?
A. Correct.
Q. And you did that more than once, correct?
A. I have traveled many times.
Q. And I suspect that Miami, Florida is not the only place you have gone to investigate cases?
A. Correct.
Q. Sometimes you're gone for a few days and sometimes a week. Is that fair to say?

A. Yeah that's correct.
Q. And HSI outfits its agents with cell phones, correct?
A. Correct.
Q. You can get a call on your cell phone even if you are in Miami and you're an agent who is stationed out of Burlington, Vermont?
A. Right.
Q. And you also can get e-mail, correct?
A. Yes.
Q. And sometimes it is important even if you're out of the district within which you are typically stationed to answer those emails?
A. Yeah it could be important.
Q. Did you ever, in any of the emails you sent to any of the agents in Florida, indicate that moving quicker was a priority?
A. I tried to word my emails in a way that didn't come across as bossy like I was telling them to do something. I thought I worded them the way that they would understand. These are experienced agents so I assume the lack of communication was because they were unavailable to respond. I did appreciate that they could have been doing things that I wasn't aware of so I didn't want to presume that I knew anything. So --

Q. But based on the number of times you said assume and presume is it correct for me to assume -- me to assume that you don't know what they were doing?
A. No I don't. No.
Q. And they never gave you an explanation?
A. Other than that they were on TDY in those two locations that's the extent of what I know.
Q. Remind me one was in London and one was in Nashville?
A. I think so, yeah.
Q. Do you recall which one was which?
A. I think Andrea was in London. It's in the e-mail.
Q. Okay. All right. Fair to say that you were getting frustrated with how long it was taking?
A. Yeah I mean I would have liked the process to have moved along quicker which is why I sent the second e-mail and she wasn't answering. She was kind of -- wasn't answering my initial questions so that was a little frustrating, but again I try not to presume I know what they are doing so.
Q. I want to show you defense exhibit B. Would you -- more emails. Would you mind taking a look at that, sir.
A. Yes.
Q. If you turn to the second page, you will see on the bottom -- again this is an e-mail Attorney Burris went

over with you, but it indicates so I just got off the phone with Nate. His preference is for me to swear out the Khalladi phone up here in Vermont?
A. Yup.
Q. And that's on May 4th?
A. Correct.
Q. So after it is determined on April 25th that AUSA Burris agrees with you that a warrant needs to issue for the phone that was seized from Mr. Khalladi's person the decision between you and Mr. Burris -- or I don't know who made the decision, I guess Attorney Burris, that decision wasn't made until May 4th that the phone should be sworn out for -- the search warrant for the phone should be sworn out here in Vermont?
A. Yeah the ultimate decision was on May 4th.
Q. All right. So you all waited to make that decision from April 25th to May 4th?
A. We waited to make decisions?
Q. To decide where the warrant would get sworn out?
A. Yes exactly.
MR. BARTH: And I would move to admit, Your Honor, exhibit B which the witness just testified about.
THE COURT: Any objection?
MR. BURRIS: No objection.
THE COURT: So admitted.

[Defense exhibit B admitted]
BY MR. BARTH:
Q. And in exhibit B you reach out to Florida, your counterparts in Florida, and ask that they ship it back to you, correct?
A. I don't reach out. Paul Altenburg reaches out.
Q. I said you and I said bag. What I meant to say was Paul Altenburg reaches out to have the phone shipped to Vermont?
A. Right.
Q. If you would turn to defense exhibit C please? Do you see there in defense exhibit C that there's an email from you to Christopher Pike who I understand to be one of your counterparts in Miami; is that correct, sir?
A. No. Chris Pike is a TFO signed to Burlington Vermont HSI.
Q. Okay. Your e-mail asks Christopher Pike any update on the phone coming from Miami. Wondering if they have even shipped it yet?
A. Right.
Q. And so you thought Christopher Pike might have some insight as to what your colleagues were doing down in Miami?
A. Yeah he was the individual in the previous e-mails that Paul asked to mail the faraday bag.

Q. I see, and this was the first time that you had inquired about whether the phone had shipped yet; is that right?
A. Yeah because we had -- I think we just asked them to ship the previous week, right?
Q. May 4th, sir. If you want me to direct you to that exhibit, I can I believe. Exhibit B is where you reached out to I guess it was Paul Altenburg and Christopher Pike?
A. Yeah so -- I see it.
Q. That's B where -- and that's where you're saying can they ship the phone up to Vermont?
A. Yeah so maybe repeat your question and I can answer it for the record.
Q. So this e-mail, which is in defense exhibit C in which you reach out to Christopher Pike and ask for an update, that was the first time you had inquired about whether the phone had been sent to Vermont from Miami?
A. So my -- so I would say my recollection is no to that. There's no way we would have gone by without me inquiring the status of the phone whether that's reflected in the previous e-mail that we don't have or whether I had in-person conversations. I would have been -- I would have been all over understanding the status and even me saying I wonder if they shipped it yet is probably alluding to the effect that I asked a few times before to

see where the status is of that phone. Does that make sense?
Q. And who would you -- it sounds like you don't have an independent recollection of making those inquiries you're just assuming you would have?
A. It would be completely out of my character and my memory -- my memory is there would have been some e-mail traffic although I don't see any right here, but it's possible I had those conversations in person with Chris or on the phone.
Q. Okay, and so was -- to your knowledge was Agent Pike was he relaying your inquiries to Miami?
A. I was inquiring of Mr. Pike. He would have been the point person with Miami when he took over the faraday bag mailing is how it worked.
Q. Understood. Do you know if Agent Pike reached out between May 4th and May 15th to say hey guys it's been 11 days what's going on?
A. I don't have an independent recollection of that sitting here today.
Q. Fair to say that this phone could have been mailed much sooner than May 15th, correct?
A. We needed -- the faraday bag was an issue. So we had to get them a faraday bag. So that adds time. So if we ship a faraday bag -- if we ship a phone without a

faraday bag from Miami it could create serious problems. In other words the phone could be -- could be wiped and so that's a major concern. So the investigative decision was we needed to get a faraday bag otherwise if it's wiped what's the point of going through all this process.

Q. Sure. So you sent a faraday bag from Burlington, Vermont to Miami, right?

A. Right.

Q. You had testified on direct examination that when the phone was seized it was put either in a faraday box or faraday bag in Miami?

A. Right.

Q. Why couldn't they just ship it?

A. Well it was in a faraday box in the forensic lab. They requested us to send them a faraday bag because they didn't have one.

Q. Is it your understanding that Homeland Security doesn't have faraday bags in Miami, Florida?

A. So it was my understanding that faraday bags in general are a hot commodity and so there could easily be shortages of faraday bags. That's just my general -- what I generally experience. For example, in Burlington we are out of them right now because they are either used or being lent to other offices. I also understand in this time period that HSI Miami was going through a large

office move, and so again I don't know the reason they requested a faraday bag, but if they requested one it means to me they didn't have one to spare. So we mailed them a faraday bag as soon as we could.

Q. So at the time this was happening it was your understanding it sounds like common knowledge that faraday bags are sort of a rare tool of the trade?

A. They are used frequently. So if you have a warrant and you seize 25 phones you can understand how quickly faraday bags, you know, would be used. I don't know what -- all I know is Miami didn't have a faraday bag. I would think that they would want to be cooperative in our investigation. If they had one, they would mail it to us. Up to that point both agents had been cooperative in our investigation and been very helpful in helping us execute the warrants in Miami and we had what I would say a good relationship with them. I wouldn't imagine they would, you know, not lend us a faraday bag if they had one. I never asked that question, but I'm trusting -- we're trusting our colleagues. So that was the dynamic around this point in time if that makes sense.

Q. My recollection from the emails is that you all overnighted the faraday bag to Miami?

A. We mailed the faraday bag. I think Chris overnighted it. That's correct.

Q. So presumably they would have gotten it the next day?
A. Yeah presumably.
Q. So sending them a faraday bag only explains one day of delay, correct?
A. Well my recollection is it was sent on -- I guess it was sent on Monday. I don't recall the exact date. So it would have gotten there the next day or if there was an issue with one day presumably gotten there the second day. I don't know when they received it. I don't think I got confirmation from Miami agents.
Q. You would agree, would you not, that had you made the warrant request in the Southern District of Florida you wouldn't have to have worried about the phone being shipped expeditiously back to Vermont, you would not have had to worry about first getting a faraday bag to Miami, correct?
A. Right.
MR. BARTH: And, Your Honor, I don't know that I moved these exhibits and I would ask that exhibits M -- I would ask exhibits C B be admitted.
THE COURT: I didn't quite hear exactly what you said so you were talking about exhibit M?
MR. BARTH: B and C I believe we were talking about, Your Honor.

THE COURT: B and C?

MR. BARTH: Yes.

THE COURT: And you want to admit both B and C?

MR. BARTH: B, C, and D, Your Honor, yes.

MR. BURRIS: No objection, Your Honor.

THE COURT: Okay. So admitted.

[Defense exhibits B, C, and D admitted]

BY MR. BARTH:

Q. Being familiar with the Smith case to some degree, Agent Ostrum, you are familiar with the idea that the Fourth Amendment is more concerned with when an application is made to a Magistrate as opposed to when that Magistrate actually signs off on a warrant. Does that sound familiar to you?

A. Can you ask the question again?

Q. The Smith case, which we discussed when we were talking about the addendum to the Holland warrant, having become familiar with that case are you also familiar with the idea that the Fourth Amendment is more concerned when agents or law enforcement make an application to a Magistrate to get a search warrant and less concerned with when the Magistrate actually issues the warrant?

A. I don't know that.

Q. In your direct testimony you mentioned -- I don't know exactly how you worded it, but I think the gist of it

was that you were surprised by the lack of responsiveness from your counterparts in Miami. Is that fair?

A. I don't -- I don't recall saying that because my understanding was that they were in, you know, in other locations. I think Andrea immediately responds to me on the day I asked all the questions and telling me where they are so I wasn't necessarily surprised. I think I would have liked the answers to my questions is how I would word it -- I would have liked.

MR. BARTH: Your Honor, may I have a moment?

THE COURT: Yes.

MR. BARTH: Your Honor, I don't have any more questions for this witness, but I would move to admit the following exhibits: Exhibit I, which I believe was Government's exhibit 2; exhibit J which I believe was Government's exhibit 1, I think I may have already admitted that; exhibit N which is an email from Agent Ostrum on May 4th, if the Government doesn't have any objection to that.

THE COURT: All right. Any objection to those exhibits?

MR. BURRIS: No, Your Honor.

THE COURT: All right. So admitted.

[Defense exhibits I, J, N admitted]

MR. BARTH: And finally I do have an exhibit O.

It's an affidavit from Mr. Khalladi. I would like to present it to the Court for consideration. I suspect the Government will object to it, but if I can bring it forward.

THE COURT: Well can you give me a summary of what he has to say?

MR. BARTH: Yes. It is just describing the difficulty that ensued after because he didn't have his phone for a period of several months and why the phone was important to him.

THE COURT: Okay and he's doing that by affidavit?

MR. BARTH: Correct.

MR. BURRIS: Your Honor, the Government would object to this. Certainly if Mr. Khalladi wishes to take the stand, he can do so and that testimony can be elicited and then he should be subjected to cross examination. As I reviewed the affidavit there are certainly things that appear in the very best light to be inaccurate and would be the subject I think of some important cross examination if these facts are to be evaluated by the Court. So the Government does object to the admission.

THE COURT: Okay. If he's going to submit some relevant testimony which goes to the heart of one of the issues in this particular case, then he can testify.

MR. BARTH: Very well, Your Honor.

THE COURT: So I'm not going to accept the admission of the affidavit.

MR. BARTH: May I submit it to the Court as a Court's exhibit for the purposes of preserving it.

THE COURT: Preserving it for the record?

MR. BARTH: For appellate review.

THE COURT: Right.

MR. BARTH: Thank you. Can I approach and hand it to the madam clerk?

THE COURT: You know if he testifies in the suppression hearing the testimony will not be used against him as a incriminatory statement.

MR. BARTH: I do. Of course I know that. Unfortunately the Government likely could use it to impeach or rebut.

THE COURT: Okay. All right.

MR. BARTH: If I may, Your Honor.

THE COURT: Yes.

MR. BARTH: Thank you.

THE COURT: All right. Any redirect?

MR. BURRIS: I just have one very brief question.

THE COURT: Okay.

MR. BURRIS: As I walk to the stand, Your Honor,

it occurs to me I may have two.

THE COURT: Oh really. If you stop at two I would be shocked, but go ahead.

REDIRECT EXAMINATION:

BY MR. BURRIS:

Q. Sir, in your communications with Agent Randou from HSI Miami is it fair to say that she indicated she would get you the information as soon as she could?

A. Yes. I can't remember how she worded it, but that's the gist of what she said.

Q. And did you understand that to mean that they would be the individuals who could provide the information that you had been inquiring about as opposed to other agents that were presently in the HSI Miami office?

A. Right. Yes exactly.

Q. Now on a different subject with regard --

THE COURT: Is this your third question?

MR. BURRIS: First one was a two-part question. This is perhaps some fuzzy math.

THE COURT: That's great. Okay go ahead.

MR. BURRIS: Thank you, Your Honor. I will be brief.

BY MR. BURRIS:

Q. With regard to the decision to seek the warrant on in Vermont on May 4th what were -- is it fair to say that

the speed of obtaining the warrant was the primary factor that drove the decision to seek the warrant in Vermont?
A. Right. The decision to do the warrant in Vermont versus Miami was a calculated decision and we thought if we could swear out the warrant in Vermont we would get the warrant quicker than going through the process in Miami.
Q. And on one hand did you consider the time necessary to overnight the device to Vermont?
A. Right.
Q. And at that point is it true that you were unaware that a faraday bag would be needed?
A. That's correct.
Q. At least to be shipped to Miami?
A. I mean a faraday bag would be needed, but one night ship there and one night shipping back I think was in the calculus. It would still be quicker to get the phone and execute the warrant here than in Miami.
Q. And did you compare that overnight shipping to the more lengthy process that had been undertaken when the warrant for Mr. Khalladi's apartment was obtained in Miami?
MR. BARTH: I'm going to object, Your Honor. One, that fact is not in evidence and, two, it's leading.
THE COURT: Objection overruled. You can answer that.

BY MR. BURRIS:
Q. You may answer.
A. I lost track of your question, but I think I recall. Based on my conversations with Agent Altenburg who swore out the residential search warrant in Miami and with conversations with the United States Attorney's Office down there, yeah it was my belief that it was -- it would be a quicker process to get the warrant in the District of Vermont than it would be to go through Florida.
MR. BURRIS: Nothing further. Thank you, Your Honor.
THE COURT: Okay. Any recross?
MR. BARTH: Yes very briefly.
RECROSS EXAMINATION:
BY MR. BARTH:
Q. Sir, when I was cross examining you a few minutes ago, maybe more than a few, I asked you about the warrant in Florida. We both agreed that it had been sworn by Agent Altenburg on April 11th and the Judge signed it on April 11th, correct?
A. Yes.
Q. You also then went on to say but I don't know when the warrant was submitted to the Judge?
A. Right. I don't know when it was submitted to the

Judge.
Q. So it could have been submitted the day before, correct?
A. It could have been. My recollection -- well it could have been. I can explain if you want.
Q. Also the prosecutor asked you a pointed question about whether the decision to have the phone mailed to Vermont was a calculated one. Do you recall that?
A. Yes.
Q. And you said it was?
A. Right.
Q. Right? Did it enter into your sort of calculation that you had asked very basic questions, straightforward questions of your colleagues in Miami on April 25th and didn't get an answer to those very straightforward questions until May 4th?
A. In the decision to execute the warrant in Vermont?
Q. Correct.
A. Yeah I think the calculus was there were several reasons -- there were several reasons based on my memory. One was the cost of going through the United Attorney's Office in Miami was really the hang up not so much the district, or that's my memory, and then, two, that if the -- all we were asking the Miami agents to do at that point was just to ship the phone to us. So we figured based on

those two factors we could get the warrant done quicker in Vermont than in Florida.
Q. So the fact that it had taken so long to get answers to basic questions didn't deter you, correct?
A. Well at that point we had -- we technically had all the answers we needed. They just needed to ship the phone.
Q. It just took you a long time to get them, right?
A. Yeah it took us -- we got them in April.
Q. And when HSI Miami told you well we can't ship it to you without a faraday bag that didn't deter your calculation that this warrant should be sworn out in Vermont, correct?
A. No, no we stuck with the plan.
Q. And you would agree that all the individuals I've been referring to, your counterparts, those are HSI agents who are part of the same Homeland Security division that you are?
A. Well I work for IRS Criminal Investigation.
Q. Excuse me. They are part of the same Homeland Security Investigations as say your partner who's on this case?
A. Paul Altenburg.
Q. Paul Altenburg. Is that correct?
A. Well I don't know that. They would be -- Miami is

a big city and they would be assigned to a task force and then they were also SWAT. They were also I think they call -- I'm forgetting the name they use -- HRT or something, but I think they have different job assignments slightly. They are both special agents to my knowledge, but that's as far as I would go on that.

Q. Sure. Let me make it more simple. All of the people who are involved in this were federal law enforcement agents, correct?

A. Correct.

Q. Who in some way were involved in the investigation of Mr. Khalladi, correct?

A. Yes, yes, that's correct.

MR. BARTH: Okay. Thank you.

THE COURT: Okay. All right. Thank you, Agent.

AGENT OSTRUM: Thank you.

THE COURT: Okay. Does the Government have any more witnesses?

MR. BURRIS: No, Your Honor, the Government has no further witnesses or evidence.

THE COURT: Okay and does the defense have any witnesses?

MR. BARTH: No, Your Honor.

THE COURT: All right. So my question is whether either side wishes to supplement its filing based

upon the testimony that was elicited today. I don't anticipate it's necessary, but you tell me if you want to supplement your filings.

MR. BARTH: I think we would at least like to consider supplementing after looking at a transcript, Your Honor.

THE COURT: Well and the Government?

MR. BURRIS: Your Honor, if the defense submits a supplemental filing the Government would intend to respond, but the Government does not independently see the need to submit any additional filings.

THE COURT: So I just -- knowing our scheduling issue would you need more than a week?

MR. BARTH: Yes, Your Honor. Is the Court indicating it doesn't think briefing or supplemental briefing is necessary?

THE COURT: I mean I don't think it's necessary. You've got adequate briefing and I've heard testimony. I just don't think it's necessary, but I don't want to also shortcircuit what you want to submit. The difficulty is you know I would like to get at least these motions resolved quickly and so I was suggesting a 10-day limit. I don't know if the transcript would be available within that time frankly.

MR. BARTH: I don't either, Your Honor. Perhaps

if I could be given some lead to figure out how long it would take to get a transcript and whether my colleagues who are part of the defense team but are not here right now whether they think it's necessary and I can inform the Government and Your Honor, is that a possibility?

THE COURT: Okay. That's fine. Well she can have a transcript next Tuesday.

MR. BARTH: Great. Maybe a week from that date if we think briefing is necessary.

THE COURT: Yeah that would be fine.

MR. BARTH: If I don't think briefing is necessary, I'll let counsel and Your Honor Chambers know.

THE COURT: All right. So that would be next Tuesday. So that would be not next Tuesday but the following Tuesday all the submissions have to be in. Okay.

MR. BARTH: Which is approximately 10 days if my math is -- give or take.

THE COURT: Approximately 10 days. Be flexible. Okay.

MR. BURRIS: And, Your Honor, in the event there is a filing the Government would just ask for seven days to respond we can keep that process moving.

THE COURT: I think actually it would be three days to respond. You know frankly I should tell you that

there's a particular law clerk who has been assigned to this case and he's submitted a whole lot of material already and he is leaving to clerk with a very close friend who is on the U.S. Court of Appeals in the 2nd Circuit and he's leaving on that Friday. So I want to make sure that he finishes with this case.

MR. BARTH: I'm sure that particular law clerk understands how much more important this particular case is than whatever is going on in the 2nd Circuit.

THE COURT: Oh you know he's going to clerk with one of my closest friends on the bench, David Hamilton, and I don't think David would be appreciative of him bringing cases from Vermont to Chicago, do you think?

MR. BARTH: He wouldn't have to know, Your Honor. That's why we have the internet.

THE COURT: So let's try -- if you want to do supplemental briefing, it would be due on Tuesday and then I would ask the Government just to turn it around quickly.

MR. BURRIS: Yes, Your Honor.

THE COURT: All right. Thank you.

[Adjourned at 5:05 p.m.]

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

July 15, 2024

______________________

Date

JoAnn Q. Carson

Court Reporter

## 0

05401 - 1:18
05402-0329 - 1:24
05402-0570 - 1:16

## 1

1 [6] 2:7, 3:4, 7:19, 8:17, 8:21, 93:16
10 [10] 2:7, 2:11, 9:23, 40:4, 40:18, 40:25, 55:22, 55:24, 103:17, 103:19
10-day - 102:22
10th - 64:25
11 [8] 1:10, 2:12, 37:22, 38:4, 38:5, 38:8, 65:12, 88:17
11:30 - 38:17
11th [10] 65:3, 65:4, 67:10, 67:11, 68:5, 68:6, 68:11, 68:13, 98:20, 98:21
12 [7] 2:8, 2:12, 18:5, 34:3, 35:2, 35:3, 35:6
12th [5] 29:16, 39:20, 44:21, 69:23, 70:3
13 [7] 2:13, 35:9, 35:23, 36:21, 36:25, 37:1, 37:4
13th - 69:23
14 [5] 2:13, 38:11, 39:11, 39:12, 39:15
14th [3] 27:4, 29:7, 29:8
15 [7] 2:14, 41:2, 42:2, 42:3, 42:6, 49:13, 105:8
150 - 1:18
15th [4] 50:6, 51:22, 88:17, 88:22
16 [5] 2:14, 44:1, 47:8, 47:9, 47:12
16th [5] 50:20, 50:25, 51:24, 53:21, 53:21
17 [8] 2:15, 47:14, 48:7, 48:8, 48:11, 54:2, 61:6, 64:20
1755.01 - 61:5
1755.17 [2] 60:18, 64:15
17th [7] 52:3, 52:5, 52:6, 52:18, 53:20, 53:22, 70:5
18 [6] 2:15, 48:13, 49:3, 49:4, 49:7, 54:8
18th [2] 53:6, 70:6
19 [6] 2:16, 49:10, 49:21, 49:22, 49:25, 64:22
198 - 71:22

## 2

2 [8] 2:7, 8:7, 9:14, 10:15, 10:19, 14:24, 40:13, 93:15
20 [6] 2:16, 50:3, 52:20, 52:21, 52:24, 53:2
2004 - 11:5
2020 - 71:22
2022 [2] 70:22, 72:12
2023 [21] 9:23, 18:5, 32:1, 32:3, 34:5, 34:25, 36:23, 38:2, 38:18, 40:13, 40:20, 41:5, 45:21, 47:17, 48:21, 49:13, 54:2, 54:8, 65:1, 68:6, 70:4
2024 [2] 1:10, 105:8
21 [5] 2:9, 2:17, 53:12, 53:13, 53:16
22 - 16:4
23 - 16:14
23-34 - 3:4
24 [7] 17:1, 50:23, 51:4, 51:5, 51:8, 51:11, 51:13
25 [2] 21:16, 90:9
25th [19] 28:11, 28:19, 28:23, 29:9, 29:17, 30:1, 31:12, 32:1, 35:13, 35:18, 35:25, 77:17, 78:5, 79:5, 80:10, 82:6, 85:7, 85:17, 99:14
26 [2] 16:14, 34:5
2667 [2] 15:19, 16:22
26th [3] 79:9, 80:11, 82:6
27 [2] 17:1, 32:3
27th [6] 32:6, 41:12, 41:17, 42:9, 43:3, 43:4
29 - 2:9
2:10 - 3:1
2:23-cr-34-1 - 1:4
2nd [5] 40:15, 40:19, 40:20, 104:4, 104:9

## 3

3 [5] 2:8, 54:6, 54:17, 54:21, 54:24
305-336-2667 - 9:17
31 - 2:10
32 - 2:10
329 - 1:23
35 - 2:12
37 [2] 2:11, 2:13
38 - 2:12
39 - 2:13
3:07 - 40:13
3:22 - 46:15
3rd [6] 34:25, 38:2, 39:4, 47:4, 71:22, 80:19

## 4

4 [12] 2:8, 11:3, 12:19, 12:20, 12:23, 14:19, 16:4, 36:23, 38:18, 41:5, 45:21, 47:17
40 - 2:11
42 - 2:14
45 - 55:21
47 - 2:14
48 - 2:15
49 [2] 2:15, 2:16
4:07 - 47:2
4:20 - 47:5
4:22 - 35:25
4:43 - 48:21
4th [15] 38:14, 44:13, 48:2, 78:23, 79:6, 82:8, 85:5, 85:12, 85:15, 85:17, 87:6, 88:17, 93:18, 96:25, 99:16

## 5

5 [5] 2:9, 21:12, 21:20, 21:21, 21:24
52 - 2:16
53 - 2:17
54 - 2:8
56 - 2:4
570 - 1:16
5:05 - 104:21
5:37 - 28:25
5:49 - 30:1
5th [3] 46:15, 47:2, 65:10

## 6

6 [12] 2:3, 2:3, 2:9, 18:7, 18:9, 18:13, 20:24, 28:5, 28:23, 29:2, 29:3, 29:6
61 - 2:22
6th - 65:14

## 7

7 [5] 2:10, 29:23, 30:25, 31:1, 31:4
7(J - 8:8
71 - 2:21
74 - 2:18
76 - 2:23
78 - 2:20
7:30 - 21:1
7th - 40:19

## 8

8 [12] 2:7, 2:10, 31:7, 31:24, 32:17, 32:18, 32:21, 60:21, 61:14, 61:25, 62:14, 63:6
8's - 62:6
802/800 - 1:24
805 [6] 8:14, 11:5, 21:6, 21:14, 59:25, 64:17
86 - 2:19
863-6067 - 1:24

## 9

9 [7] 2:11, 37:7, 37:16, 37:17, 37:20, 48:20, 48:21
92 [2] 2:19, 2:20
93 [3] 2:21, 2:22, 2:23
95 - 1:18
96 - 2:4
967 - 71:22
98 - 2:5

## A

A-N-D-E-R-S - 5:24
a.m [3] 18:7, 18:9, 18:13
ability - 68:7
able [11] 17:14, 20:19, 25:13, 25:15, 25:17, 26:5, 26:11, 26:17, 50:5, 51:1, 79:13
above-entitled - 105:5
abundance - 61:4
accept - 95:2
access [8] 17:7, 17:13, 24:16, 26:10, 30:13, 30:14, 30:15, 65:11
account - 4:5
across [2] 75:11, 83:19
Act - 7:2
actions - 26:8
activities [3] 14:3, 14:5, 18:8
acts - 24:11
actual - 19:13
add - 69:10
added - 46:8
addendum [7] 71:4, 71:7, 71:16, 71:18, 72:22, 73:1, 92:17
addition [3] 15:21, 41:19, 41:20
additional [3] 55:12, 78:7, 102:11
address [15] 3:17, 5:4, 8:10, 8:13, 8:14, 11:7, 11:8, 20:22, 21:10, 21:15, 22:4, 38:15, 38:17, 65:25, 75:23
addressing - 3:14
adds - 88:24
adequate - 102:18
Adjourned - 104:21
admission [4] 40:22, 61:3, 94:22, 95:3
admit [27] 8:17, 10:15, 12:19, 21:19, 29:1, 30:24, 32:17, 35:1, 36:24, 37:15, 38:3, 39:11, 40:17, 42:1, 47:7, 48:6, 49:2, 49:20, 52:19, 53:11, 54:16, 71:10, 74:3, 76:11, 85:21, 92:3, 93:13
admitted [66] 2:6, 8:20, 8:21, 10:18, 10:19, 12:22, 12:23, 21:23, 21:24, 29:5, 29:6, 31:3, 31:4, 32:20, 32:21, 35:5, 35:6, 37:3, 37:4, 37:19, 37:20, 38:7, 38:8, 39:14, 39:15, 40:24, 40:25, 42:5, 42:6, 47:11, 47:12, 48:10, 48:11, 49:6, 49:7, 49:24, 49:25, 52:23, 52:24, 53:15, 53:16, 54:20, 54:21, 57:3, 57:6, 61:11, 61:12, 71:13, 71:14, 74:4, 74:8, 74:9, 76:12, 76:14, 76:16, 76:17, 78:13, 78:14, 85:25, 86:1, 91:21, 92:6, 92:7, 93:17, 93:23, 93:24
advance - 31:20
affiant - 10:2
affidavit [29] 4:6, 13:4, 16:5, 17:5, 30:8, 30:9, 31:14, 32:6, 33:12, 33:17, 34:9, 35:14, 35:16, 41:7, 41:24, 51:13, 51:16, 53:23, 53:24, 60:1, 63:3, 63:25, 77:17, 77:19, 77:22, 94:1, 94:12, 94:18, 95:3
affirm - 6:2
afternoon [7] 3:2, 6:9, 6:10, 6:13, 6:14, 56:5, 56:6
afterwards - 66:14
against - 95:12
agencies [3] 33:3, 33:6, 33:8
agent [71] 5:21, 5:24, 6:6, 6:9, 6:10, 6:16, 6:22, 6:24, 7:4, 8:23, 10:4, 10:6, 10:8, 13:7, 13:15, 17:25, 18:1, 18:1, 22:22, 23:15, 24:25, 27:21, 29:9, 30:16, 33:21, 34:13, 34:20, 34:23, 35:12, 36:10, 38:24, 40:20, 41:5, 46:1, 46:4, 47:3, 47:25, 48:5, 53:6, 56:5, 63:23, 65:9, 67:20, 68:2, 68:13, 69:24, 76:1, 76:3, 76:6, 76:22, 77:16, 79:12, 79:19, 79:25, 80:12, 80:12, 80:17, 81:2, 81:2, 81:5, 81:6, 83:6, 88:11, 88:16, 92:10, 93:17, 96:6, 98:4, 98:20, 101:15, 101:16
Agent's [3] 43:18, 51:13, 51:16
agents [53] 11:24, 12:3, 12:13, 12:16, 14:1, 14:9, 14:9, 19:8, 22:4, 22:6, 22:11, 22:12, 27:2, 30:6, 30:18, 30:19, 33:7, 33:11, 34:7, 36:20, 36:13, 38:1, 38:20, 38:23, 46:17, 46:18, 48:22, 52:13, 53:8, 65:5, 65:8, 65:22, 66:8, 66:17, 68:2, 79:18, 79:22, 80:8, 80:16, 80:24, 81:14, 81:17, 83:2, 83:16, 83:21, 90:14, 91:11, 92:20, 96:13, 99:24, 100:16, 101:5, 101:9
agree [6] 61:20,

69:20, 79:1, 79:3, 91:12, 100:15
agreed - 98:19
agreements - 14:10
agrees - 85:8
ahead [6] 31:21, 66:3, 74:3, 75:2, 96:3, 96:20
airplane [2] 26:15, 26:18
allegations - 7:12
alleged [2] 58:18, 62:19
allow [2] 17:12, 26:10
allude - 21:10
alluded - 62:16
alluding [2] 63:5, 87:25
already [7] 61:2, 61:10, 69:10, 74:4, 76:12, 93:16, 104:3
Altenburg [22] 10:4, 10:6, 13:15, 18:1, 23:15, 27:18, 27:21, 44:4, 45:24, 46:5, 46:14, 53:6, 67:20, 68:3, 68:13, 86:6, 86:8, 87:8, 98:4, 98:20, 100:23, 100:24
alter - 24:17
alternate - 69:19
although [4] 41:22, 79:10, 79:14, 88:8
Amber [2] 31:10, 31:25
Amendment [2] 92:11, 92:19
America [2] 1:4, 3:4
amongst - 19:1
amount [2] 15:8, 52:7
analysis - 56:8
analyst [2] 25:3, 30:2
Anders [4] 2:3, 5:21, 5:24, 6:16
Andrea [12] 12:12, 12:15, 22:12, 34:6, 35:12, 37:14, 39:4, 53:7, 78:5, 80:18, 84:12, 93:5
Angeles - 13:24
answered - 80:25
answering [3] 78:20, 84:17, 84:18
answers [12] 39:5, 39:6, 39:8, 78:21, 79:6, 79:23, 80:13, 80:15, 81:12, 93:8, 100:4, 100:6
anticipate [2] 55:19, 102:2
apartment [12] 11:5, 21:17, 22:9, 22:14, 64:7, 65:25, 66:8, 66:15, 67:10, 67:24, 68:8, 97:20
apologize - 69:12
Appeals - 104:4
appear [3] 16:19, 30:10, 94:19
APPEARANCES - 1:14
appeared [2] 18:23, 80:20
appellate - 95:7
application [19] 9:15, 16:5, 16:15, 17:3, 17:12, 53:24, 59:25, 60:10, 64:17, 67:19, 69:10, 69:17, 70:16, 70:19, 71:4, 71:23, 77:14, 92:12, 92:20
applying [2] 16:17, 16:17
appointment - 51:14
appreciate - 83:23
appreciative - 104:12
approach [3] 5:15, 43:22, 95:9
appropriate - 13:10
appropriately - 71:25
approval [3] 33:21, 47:18, 47:21
approved [3] 8:11, 32:15, 33:21
approximately [8] 18:7, 18:24, 46:15, 47:5, 65:11, 65:15, 103:17, 103:19
April [41] 9:23, 18:5, 27:4, 28:11, 29:8, 29:9, 29:16, 29:17, 30:1, 31:12, 32:1, 32:3, 32:6, 34:5, 35:13, 35:18, 35:25, 39:20, 41:12, 41:17, 42:8, 43:3, 43:4, 44:21, 64:25, 65:9, 65:14, 67:11, 68:6, 70:3, 77:17, 78:5, 79:5, 79:9, 82:6, 85:7, 85:17, 98:20, 98:21, 99:14, 100:9
areas - 82:11
aren't - 26:7
argument [6] 4:3, 4:18, 4:21, 5:4, 5:7, 5:12
arrested [4] 21:18, 39:21, 65:18, 73:25
arrival - 45:19
arrive - 50:19
arrived [4] 50:9, 50:25, 53:19, 53:20
aside - 10:11
asking [16] 30:2, 30:4, 34:8, 35:14, 40:11, 44:7, 46:1, 49:14, 53:9, 74:19, 77:22, 78:19, 81:10, 81:11, 81:17, 99:24
asks [4] 46:6, 46:15, 47:2, 86:17
assigned [15] 8:24, 9:16, 9:19, 9:20, 10:1, 11:19, 12:3, 12:10, 12:13, 30:15, 34:6, 36:14, 82:12, 101:1, 104:1
assignment [2] 36:9, 39:7
assignments [2] 78:24, 101:4
assistance [3] 11:23, 12:2, 12:4
Assistant [5] 1:16, 1:17, 3:6, 3:8, 72:19
assisting - 18:11
associated [6] 9:25, 14:23, 15:18, 16:22, 18:14, 70:23
assume [6] 50:13, 50:15, 83:21, 84:1, 84:2, 84:2
assumed - 3:14
assuming [2] 50:9, 88:5
assumption [2] 26:18, 50:20
AT&T [4] 9:16, 9:24, 18:18, 18:23
attached [3] 41:7, 44:12, 47:20
attended - 82:10
attention [25] 8:7, 9:13, 16:3, 16:13, 28:8, 28:22, 29:22, 31:6, 31:8, 34:2, 35:8, 35:22, 36:1, 36:20, 38:10, 44:2, 46:3, 46:12, 51:17, 54:9, 56:17, 57:13, 60:16, 67:8, 78:1
attorney [9] 1:18, 3:8, 40:11, 40:12, 72:19, 75:11, 76:1, 84:25, 85:11
Attorney's [7] 13:12, 33:13, 33:17, 33:23, 72:17, 98:6, 99:21
attorneys [4] 1:16, 1:16, 3:6, 72:16
attributed - 60:14
attribution - 39:2
AUSA [4] 31:13, 72:20, 75:15, 85:7
authorized [3] 8:10, 8:13, 8:14
available [4] 50:8, 51:19, 52:4, 102:23
Avenue [2] 11:5, 21:15
awaiting - 60:6

**B**

bag [36] 24:19, 45:10, 46:11, 46:16, 46:19, 46:20, 46:21, 46:23, 47:4, 48:18, 48:20, 48:22, 48:25, 49:12, 86:7, 86:25, 88:15, 88:23, 88:24, 88:25, 89:1, 89:4, 89:6, 89:11, 89:15, 90:2, 90:4, 90:11, 90:18, 90:23, 90:24, 91:4, 91:16, 97:11, 97:14, 100:11
bags [6] 24:9, 89:18, 89:19, 89:21, 90:7, 90:10
bail - 60:9
Bank - 7:2
bargain - 52:12
Barnett - 40:8
Barth [83] 1:17, 2:4, 2:5, 3:8, 4:7, 4:8, 4:11, 8:19, 10:17, 12:21, 21:22, 29:4, 31:2, 32:19, 35:4, 37:2, 37:18, 38:6, 39:13, 40:23, 42:4, 47:10, 48:9, 49:5, 49:23, 52:22, 53:14, 54:19, 55:18, 55:21, 56:1, 56:2, 56:4, 57:7, 57:12, 61:1, 61:6, 61:13, 64:4, 71:9, 71:15, 73:10, 73:15, 74:10, 75:24, 76:9, 76:18, 77:25, 78:10, 78:15, 80:23, 85:21, 86:2, 91:19, 91:24, 92:2, 92:4, 92:8, 93:10, 93:12, 93:25, 94:7, 94:13, 95:1, 95:4, 95:7, 95:9, 95:14, 95:18, 95:20, 97:22, 98:14, 98:16, 101:14, 101:23, 102:4, 102:14, 102:25, 103:8, 103:11, 103:17, 104:7, 104:14
basic [5] 79:2, 79:4, 81:1, 99:13, 100:4
basically [15] 12:1, 16:16, 17:12, 17:14, 20:19, 24:11, 31:13, 43:12, 44:12, 48:19, 64:12, 67:4, 75:3, 77:6, 77:19
Bates - 60:18
battery [2] 45:14, 45:15
bear - 64:14
became [2] 7:8, 7:10
Becher - 40:10
become [3] 7:5, 14:1, 92:18
begin [3] 4:21, 28:24, 34:11
Beginning - 3:1
behind - 10:11
belief [3] 60:13, 62:14, 98:7
believed [11] 15:23, 19:9, 21:7, 36:4, 43:15, 43:16, 43:21, 59:3, 61:18, 62:18, 63:7
belong - 36:5
bench - 104:11
best [2] 25:13, 94:19
better [4] 34:21, 72:9, 76:6, 80:1
biometric - 17:6
biometrics - 17:4
bit [4] 51:2, 58:21, 62:12, 79:17
books - 52:10
bossy - 83:19
bottom [6] 35:22, 44:2, 53:5, 54:9, 60:21, 84:25
box [12] 1:16, 1:23, 24:7, 24:8, 24:19, 24:21, 25:20, 26:19, 45:8, 45:10, 89:10, 89:14
boxes [2] 24:9, 57:24
brief [4] 13:19, 72:18, 95:22, 96:22
briefing [6] 102:15, 102:16, 102:18, 103:9, 103:11, 104:17
briefly [3] 5:15, 45:1, 98:14
bring [2] 66:11, 94:3
bringing [2] 75:8, 104:13
brother - 20:10
brought [2] 23:10, 23:11
building [10] 14:11, 19:25, 19:25, 21:17, 22:7, 64:22, 65:11, 65:15, 65:20, 66:12
buildings [2] 19:11, 19:24
bulk - 82:7
burdensome [2] 43:21, 77:9
Burlington [11] 1:11, 1:16, 1:18, 1:24, 30:2, 30:13, 44:11, 83:7, 86:15, 89:6, 89:22
Burris [90] 1:15, 2:3, 2:4, 3:7, 3:16, 4:1, 4:17, 5:8, 5:14, 5:17, 5:20, 6:12, 8:16, 8:22, 10:14, 10:20, 12:18, 12:24, 21:19, 21:25, 29:1, 29:10, 29:13, 29:21, 30:24, 31:5, 31:13, 32:16, 32:22, 33:24, 34:1, 35:1, 35:7, 36:24, 37:5, 37:15, 37:21, 38:3, 38:9, 39:10, 39:16, 40:17, 41:1, 42:1, 42:7, 47:7, 47:13, 48:6, 48:12, 49:2, 49:8, 49:20, 50:1, 52:19, 52:25, 53:11, 53:17, 54:16, 54:22, 55:6, 55:8, 55:14, 61:9, 71:12, 74:7, 74:12, 74:24, 75:15, 76:15, 78:12, 84:25, 85:8, 85:10, 85:11, 85:24, 92:5, 93:22, 94:14, 95:22, 95:25, 96:5, 96:18, 96:21, 96:23, 98:1, 98:11, 101:19, 102:8, 103:21, 104:19
burst - 52:8
busy [2] 79:13, 80:9

## C

calculated [2] 97:4, 99:8
calculation [2] 99:12, 100:12
calculus [3] 50:24, 97:16, 99:19
California - 11:21
calling [2] 5:10, 5:14
can't [9] 23:22, 24:14, 26:16, 36:15, 67:6, 81:8, 82:2, 96:9, 100:10
capacity [2] 6:21, 7:4
CAPITOL - 1:23
Carson [2] 1:20, 105:10
case [50] 1:4, 3:3, 7:8, 7:9, 7:10, 7:12, 7:13, 7:16, 8:1, 8:3, 9:4, 9:4, 9:8, 10:8, 11:19, 11:23, 12:1, 12:2, 12:13, 13:9, 13:25, 14:9, 14:13, 15:24, 22:13, 25:13, 27:13, 30:3, 30:6, 30:15, 33:14, 70:9, 70:11, 70:12, 70:23, 72:5, 72:20, 72:24, 73:8, 74:16, 76:14, 81:6, 92:9, 92:16, 92:18, 94:25, 100:22, 104:2, 104:6, 104:8
cases [6] 7:5, 11:20, 13:23, 55:24, 82:22, 104:13
cause [3] 4:5, 5:4, 6:4
causing - 19:12
caution - 61:4
cc [2] 35:12, 41:5
cell [17] 1:9, 3:10, 9:18, 15:18, 15:22, 15:23, 16:12, 17:9, 17:10, 25:1, 26:2, 26:13, 54:13, 56:8, 73:3, 83:2, 83:5
cellular [2] 9:16, 15:4
certain [2] 75:11, 75:18
certainly [5] 27:20, 64:1, 72:9, 94:15, 94:18
certify - 105:4
chain [5] 28:6, 28:10, 45:22, 46:13, 47:1
Chambers [5] 33:14, 50:22, 50:22, 54:4, 103:12
chance - 19:12
chances - 25:16
chaotic - 67:1
character - 88:6
characteristics [2] 17:7, 17:13
charge [3] 20:17, 33:22, 48:5
charged [2] 62:25, 63:21
charger [2] 44:11, 45:2
check - 65:2
checked - 59:9
Chicago - 104:13
choice - 69:22
chores - 58:8
Chris [12] 18:1, 44:5, 47:2, 47:4, 48:22, 49:11, 49:11, 49:14, 50:17, 86:15, 88:9, 90:24
Christopher [5] 86:13, 86:17, 86:21, 87:8, 87:15
CI [6] 32:23, 33:5, 33:16, 47:24, 52:14, 77:3
Circuit [3] 71:22, 104:5, 104:9
circumstances - 72:25
city [2] 67:6, 101:1
clarification - 78:19
clarify [2] 29:12, 74:25
clarifying - 74:1
clear [3] 39:5, 70:2, 81:21
clerk [6] 3:3, 95:10, 104:1, 104:3, 104:7, 104:10
close [3] 3:20, 41:15, 104:3
closest - 104:11
cloud - 3:14
co-case [5] 10:8, 35:12, 41:5, 47:3, 48:22
co-tenant - 60:5
code [3] 7:1, 26:4, 26:9
coincidence [4] 61:20, 62:12, 62:17, 63:12
collateral [17] 11:12, 11:14, 11:25, 12:1, 12:2, 12:5, 12:8, 12:10, 12:13, 22:13, 30:6, 30:15, 34:6, 34:20, 79:18, 80:16, 81:6
colleagues [5] 78:3, 86:22, 90:20, 99:14, 103:2
collecting - 65:6
comes [2] 56:8, 56:11
coming [2] 49:15, 86:18
commence - 31:25
committed [2] 61:22, 62:19
commodity - 89:20
common [2] 11:15, 90:6
communication - 83:22
communications - 96:6
compare - 97:18
compared - 13:20
complete [3] 41:13, 42:20, 43:8
completed [6] 23:10, 41:9, 41:11, 41:17, 42:8, 53:23
completely - 88:6
completeness - 34:18
complicated [2] 58:25, 77:7
comply - 79:13
component - 17:18
computer - 23:17
concept - 76:2
concern [3] 4:25, 67:5, 89:3
concerned [6] 58:13, 65:10, 76:4, 92:11, 92:19, 92:21
concerning - 77:5
concur [2] 28:15, 28:21
concurrence [2] 44:13, 47:21
condition [2] 57:15, 57:17
conditions [6] 7:25, 11:10, 56:25, 58:2, 58:17, 58:18
condo - 20:5
condominium - 19:25
conducted - 18:8
conducting - 22:24
confirm - 15:15
confirmation [2] 75:9, 91:11
confirmed [4] 18:23, 21:4, 29:18, 64:10
confirming [6] 15:21, 28:11, 38:1, 39:1, 75:3, 75:6
confirms - 80:19
conflict [2] 52:6, 55:23
conjunction - 36:18
connection [5] 7:16, 9:8, 9:11, 10:21, 12:6
consider [2] 97:7, 102:5
consideration [2] 6:4, 94:2
considered - 71:25
consisting [4] 31:7, 34:3, 35:9, 44:1
conspiracy - 9:6
contact [2] 38:24, 79:18
contain - 16:19
content - 46:4
context - 79:15
continue - 32:2
continued - 42:19
continuing - 31:24
contractors - 52:17
conversation [9] 19:5, 19:9, 20:14, 28:1, 28:6, 28:13, 31:25, 43:11, 77:23
conversations [4] 87:22, 88:9, 98:4, 98:6
converse - 27:22
conversed - 27:25
convince - 77:6
cooperative [2] 90:12, 90:14
coordinating - 44:8
coordination [2] 13:11, 13:13
copying - 16:18
corners - 4:13
correct [98] 3:15, 12:17, 14:21, 27:10, 27:14, 34:12, 44:25, 48:1, 49:1, 52:2, 54:15, 56:16, 56:24, 57:2, 57:4, 57:5, 57:24, 57:25, 58:4, 58:5, 58:9, 58:10, 58:15, 58:19, 60:11, 62:1, 62:2, 62:5, 62:8, 63:15, 64:7, 64:19, 64:24, 65:1, 65:6, 65:7, 65:16, 67:12, 67:13, 67:16, 67:17, 67:21, 67:22, 67:25, 68:1, 68:4, 68:8, 68:22, 69:1, 69:2, 69:22, 69:25, 70:1, 70:20, 70:24, 71:1, 71:2, 72:3, 72:6, 72:14, 73:19, 73:25, 74:1, 74:21, 78:4, 78:9, 78:17, 79:19, 82:5, 82:9, 82:18, 82:19, 82:23, 83:1, 83:3, 83:4, 83:9, 84:2, 85:6, 86:5, 86:14, 88:22, 90:25, 91:5, 91:17, 94:13, 97:12, 98:21, 99:3, 99:18, 100:4, 100:13, 100:24, 101:9, 101:10, 101:12, 101:13, 105:4
cost - 99:21
coughing - 69:13
couldn't [3] 50:15, 76:6, 89:13
counsel [9] 5:15, 32:12, 32:15, 33:19, 33:19, 47:22, 73:17, 73:22, 103:12
counterparts [4] 86:4, 86:14, 93:2, 100:16
course [2] 60:17, 95:14
court [144] 1:1, 1:20, 1:23, 3:2, 3:9, 3:12, 3:23, 4:7, 4:10, 4:14, 4:20, 4:23, 4:25, 5:11, 5:16, 5:19, 6:9, 7:24, 8:11, 8:18, 8:20, 10:16, 10:18, 12:20, 12:22, 13:14, 21:21, 21:23, 29:3, 29:5, 29:7, 29:12, 29:20, 31:1, 31:3, 32:18, 32:20, 33:25, 35:3, 35:5, 37:1, 37:3, 37:17, 37:19, 38:5, 38:7, 39:12, 39:14, 40:19, 40:21, 40:24, 42:3, 42:5, 47:9, 47:11, 48:8, 48:10, 49:4, 49:6, 49:22, 49:24, 52:21, 52:23, 53:13, 53:15, 54:18, 54:20, 55:7, 55:10, 55:16, 55:19, 55:22, 56:1, 56:20, 57:6, 61:5, 61:8, 61:11, 62:21, 63:20, 64:3, 71:11, 71:13, 73:12, 73:14, 74:5, 74:8, 75:22, 75:25, 76:4, 76:8, 76:13, 76:16, 77:14, 78:13, 79:17, 79:20, 80:14, 85:23, 85:25, 91:22, 92:1, 92:3, 92:6, 93:11, 93:20, 93:23, 94:2, 94:5, 94:11, 94:21, 94:23, 95:2, 95:4, 95:6, 95:8, 95:11, 95:17, 95:19, 95:21, 95:24, 96:2, 96:17, 96:20, 97:24, 98:13, 101:15, 101:17, 101:21, 101:24, 102:7, 102:12, 102:14, 102:17, 103:6, 103:10, 103:13, 103:19, 103:24, 104:4, 104:10, 104:16, 104:20, 105:11
Court's - 95:5
COURTROOM [3] 5:22, 6:1, 6:7
cover - 68:14
Crawford - 73:11
create - 89:1
crime - 62:20
crimes - 7:1
criminal [21] 3:3, 6:20, 6:22, 6:25, 7:5, 8:3, 30:2, 31:16, 32:12, 58:23, 59:4, 59:8, 59:10, 59:11, 59:16, 59:21, 60:2, 62:16, 62:25, 63:8, 100:19
critical [6] 17:18, 17:18, 41:23, 46:23, 46:24, 77:18
cross [6] 2:4, 55:20, 56:3, 94:17, 94:20, 98:17
crummy - 45:14
cumbersome [2] 13:23, 77:3
curfew - 57:20
currently - 6:17

## D

data [13] 17:16, 17:17, 18:14, 24:14, 24:17, 24:17, 25:10, 25:14, 25:14, 25:16, 56:12, 56:15, 65:5
date [12] 18:3, 28:17, 35:17, 41:12, 45:23, 52:11, 52:15, 54:10, 55:3, 91:7, 103:8, 105:10
dated - 40:12
daughter - 39:2
David [32] 20:11, 58:21, 59:1, 59:3, 59:5, 59:6, 59:7, 59:11, 59:12, 59:15, 60:11, 60:14, 61:16, 61:17, 61:22, 62:7, 62:10, 62:15, 62:15, 62:18, 62:22, 62:23, 62:25,

63:5, 63:7, 63:10, 63:11, 63:12, 63:20, 66:6, 104:11, 104:12
de [2] 1:15, 3:6
dead - 45:19
deadline - 3:18
deal - 45:18
dealing - 4:15
dealt - 80:3
debrief [3] 66:20, 66:22, 66:22
decent - 15:8
decide [2] 19:16, 85:19
decided [4] 4:12, 19:17, 34:11, 42:23
deciding - 78:6
decision [14] 43:12, 43:14, 85:10, 85:11, 85:11, 85:15, 85:16, 89:3, 96:24, 97:2, 97:3, 97:4, 99:7, 99:17
decisions - 85:18
decrypt - 17:15
deemed [2] 41:23, 75:19
defendant [3] 1:18, 3:4, 3:7
Defender [2] 1:18, 3:8
defense [30] 2:18, 40:10, 55:17, 56:17, 56:21, 57:9, 60:16, 61:12, 67:8, 69:1, 71:10, 71:14, 73:12, 73:20, 74:2, 74:9, 76:10, 76:17, 78:1, 78:14, 84:21, 86:1, 86:11, 86:12, 87:14, 92:7, 93:24, 101:21, 102:8, 103:3
defer - 4:20
deferred - 39:4
deferring [3] 34:19, 44:12, 80:11
defers - 80:19
definitely - 33:8
degree - 92:9
delay [2] 51:11, 91:5
delayed - 75:18
depending - 79:11
depicted - 53:4
DEPUTY [4] 3:3, 5:22, 6:1, 6:7
derived - 73:7
describe [14] 6:23, 16:14, 17:2, 19:19, 19:22, 20:1, 20:3, 20:14, 22:1, 40:7, 45:22, 46:25, 51:11, 53:4
described [6] 16:20, 20:21, 47:24, 61:25, 62:6, 68:25
describes - 60:10
describing [3] 61:15, 61:17, 94:7
description - 64:20
despite - 60:13
detail - 44:19
detailed [3] 14:23, 35:14, 79:9
details [4] 13:6, 22:3, 37:9, 66:25
detained [4] 7:16, 39:22, 39:23, 40:1
detention - 57:20
deter [2] 100:4, 100:11
determined [2] 71:24, 85:7
device [15] 9:16, 10:1, 15:4, 18:24, 19:13, 24:10, 24:11, 25:10, 25:11, 25:14, 25:15, 26:10, 27:4, 67:24, 97:8
devices [5] 16:2, 16:11, 17:7, 23:23, 24:10
die - 45:14
difference [3] 41:16, 41:19, 41:19
difficulty [2] 94:8, 102:20
digital - 17:19
direct [14] 2:3, 6:11, 8:7, 29:22, 31:6, 34:2, 56:17, 60:4, 60:16, 67:8, 76:10, 87:6, 89:9, 92:24
directed - 80:5
directing [17] 9:13, 16:3, 16:13, 28:8, 28:22, 31:8, 35:8, 35:22, 36:1, 36:20, 38:10, 44:2, 46:3, 46:12, 51:17, 54:9, 78:1
directs - 57:16
discovered - 59:5
discussed [5] 35:19, 67:4, 75:16, 75:17, 92:16
discussing [3] 19:14, 61:15, 64:14
discussion [10] 19:1, 19:15, 23:14, 29:15, 31:12, 42:14, 42:16, 50:4, 64:22, 72:18
discussions - 72:16
district [46] 1:1, 1:2, 1:13, 7:9, 7:24, 7:24, 11:9, 12:4, 13:11, 13:13, 13:21, 26:23, 27:16, 40:9, 42:9, 42:10, 42:12, 42:21, 43:6, 43:13, 43:17, 43:23, 44:7, 44:24, 50:19, 53:19, 57:1, 58:2, 58:3, 58:12, 60:6, 63:21, 67:14, 67:16, 67:21, 68:20, 70:5, 71:25, 73:18, 78:3, 79:23, 82:14, 83:12, 91:13, 98:9, 99:23
districts [3] 11:16, 13:9, 15:8
division - 100:17
document [8] 7:22, 7:23, 8:2, 8:5, 8:8, 40:5, 40:7, 40:22
documentation - 47:20
downtown [5] 8:15, 19:11, 19:21, 19:22, 19:23
Doyle - 70:22
draft [20] 32:6, 32:8, 33:17, 41:9, 41:11, 41:13, 41:14, 41:16, 41:17, 41:25, 42:8, 42:11, 42:13, 42:20, 43:6, 43:8, 50:22, 51:1, 77:17, 78:7
drafted - 42:25
draw - 57:13
drive - 20:19
drove [2] 66:4, 97:2
due [4] 52:7, 72:24, 77:4, 104:17
duties - 6:23
duty - 36:9
dynamic - 90:20

E

e-mail [36] 1:25, 28:6, 28:9, 31:11, 34:7, 34:10, 34:14, 34:15, 34:24, 35:11, 35:13, 35:17, 35:20, 41:18, 45:20, 45:23, 46:4, 49:16, 51:3, 53:1, 53:5, 74:2, 74:23, 76:23, 79:9, 80:1, 80:1, 82:2, 83:9, 84:12, 84:16, 84:25, 86:17, 87:14, 87:21, 88:7
e-mailing - 74:12
e-mails - 86:24
easier - 13:25
easily - 89:20
easy [2] 24:15, 77:13
educated - 72:13
effect [3] 64:9, 65:23, 87:25
effected - 38:23
effectuated - 66:18
efficiency - 15:16
either [7] 36:17, 45:16, 72:13, 89:10, 89:23, 101:25, 102:25
elder - 9:4
elderly - 60:7
electronic [10] 16:2, 16:11, 17:7, 23:7, 23:22, 24:5, 24:10, 57:16, 57:19, 67:23
electronics [5] 23:10, 23:17, 26:22, 26:23, 26:25
elevate - 48:4
elevator - 65:11
elicited [2] 94:16, 102:1
Elmo - 29:11
else's - 45:13
email [17] 29:25, 31:10, 34:5, 37:8, 38:13, 40:8, 41:4, 44:4, 45:25, 47:16, 48:21, 49:11, 53:5, 78:5, 81:11, 86:12, 93:17
emailing [2] 30:1, 40:10
emails [11] 45:22, 73:16, 73:21, 77:4, 81:13, 81:18, 83:13, 83:15, 83:18, 84:22, 90:22
emphasis - 67:4
employed [2] 6:17, 6:21
enable - 17:16
encounter - 17:8
encountered [13] 20:6, 20:22, 20:24, 21:1, 22:17, 23:2, 24:3, 59:8, 59:15, 63:10, 65:21, 66:5, 66:9
ending [2] 15:19, 16:22
enforcement [5] 11:15, 11:24, 26:6, 92:20, 101:9
engaged - 14:2
engaging - 82:14
ensued [2] 42:16, 94:8
ensuing [3] 45:22, 46:3, 51:21
ensure - 53:9
ensures - 17:14
enter - 99:12
entered - 78:11
entire - 61:7
entirety - 16:12
entry - 20:5
equivalent - 36:14
erase - 24:17
error - 19:13
especially - 15:8
Esq [2] 1:15, 1:17
essentially [4] 16:16, 17:5, 24:9, 24:13
evaluated - 94:21
event [2] 74:23, 103:21
events - 63:6
eventually - 17:16
evidence [22] 1:9, 1:10, 3:10, 3:11, 6:3, 15:25, 16:20, 17:19, 22:25, 23:13, 23:14, 24:5, 39:2, 52:8, 52:13, 61:2, 61:3, 61:10, 73:7, 78:11, 97:23, 101:20
evidentiary [6] 3:24, 4:2, 4:19, 4:22, 15:19, 16:22
exact [4] 26:4, 64:8, 66:25, 91:7
exactly [6] 57:23, 72:13, 85:20, 91:22, 92:25, 96:15
examination [11] 2:3, 2:4, 2:4, 2:5, 6:11, 56:3, 89:9, 94:17, 94:20, 96:4, 98:15
examining - 98:17
example [2] 11:21, 89:22
excuse [7] 22:18, 50:21, 60:5, 65:4, 67:19, 69:5, 100:20
execute [11] 11:16, 11:22, 11:25, 19:4, 19:4, 19:17, 46:7, 47:18, 90:15, 97:17, 99:17
executed [8] 18:4, 18:6, 19:20, 20:4, 20:24, 29:16, 39:20, 59:5
execution [12] 14:3, 14:7, 14:15, 14:17, 18:12, 18:16, 23:9, 24:1, 44:21, 59:2, 62:24, 63:9
exhibit [118] 7:19, 8:17, 8:21, 9:14, 10:15, 10:19, 11:3, 12:19, 12:23, 14:19, 14:23, 16:3, 21:11, 21:20, 21:24, 28:5, 28:22, 29:2, 29:6, 29:11, 29:23, 30:25, 31:7, 31:24, 32:17, 32:21, 34:3, 34:18, 35:2, 35:6, 35:9, 35:23, 36:21, 36:25, 37:4, 37:7, 37:16, 37:20, 37:22, 38:4, 38:8, 38:11, 39:11, 39:15, 40:4, 40:18, 40:25, 41:2, 42:2, 42:3, 42:6, 44:1, 47:8, 47:12, 47:14, 48:7, 48:11, 48:13, 49:3, 49:7, 49:10, 49:25, 50:3, 52:20, 52:24, 53:2, 53:12, 53:16, 54:5, 54:10, 54:17, 54:21, 54:24, 56:18, 56:21, 57:8, 57:14, 60:16, 60:17, 60:18, 61:7, 61:12, 64:15, 67:9, 67:9, 69:1, 70:14, 71:10, 71:14, 71:21, 73:11, 73:12, 73:20, 73:20, 74:2, 74:9, 76:10, 76:17, 78:1, 78:10, 78:14, 84:21, 85:22, 86:1, 86:3, 86:11, 86:12, 87:7, 87:7, 87:14, 91:23, 93:14, 93:15, 93:15, 93:16, 93:17, 93:25, 95:5
exhibits [12] 2:6, 56:19, 56:20, 57:9, 57:10, 91:20, 91:20, 91:21, 92:7, 93:14, 93:21, 93:24
exibit - 31:4
expansive - 76:7
expect - 37:13
expected - 17:8
expedite [3] 31:22, 77:15, 77:20
expeditiously - 91:15
expenses - 60:9
experience [7] 13:20, 17:9, 24:25, 25:4,

33:11,
82:13, 89:22
experienced [2]
13:21, 83:21
expert [3] 56:7,
56:11, 56:14
explain [7] 11:14,
45:2, 51:4, 63:19,
66:2, 77:1, 99:5
explained [2]
13:22, 72:21
explains - 91:4
explanation - 84:5
extensive - 31:15
extent [4] 4:23,
71:17, 71:21,
84:7
extra - 26:19
extract [2] 25:13,
25:15
extracted - 81:2
extracting - 25:16
extraction [7]
17:17, 25:1,
25:10, 26:11,
26:12, 45:7,
56:15
extractions - 25:8
extreme [2] 44:18,
52:11

F

face - 26:4
facial - 17:11
facilitate - 80:13
factor - 97:1
factors [2] 75:18,
100:1
facts - 94:21
fair [30] 17:20,
34:10, 41:8,
41:18, 44:22,
46:18, 48:24,
51:18, 56:7,
56:11, 56:14,
58:11, 61:15,
68:18, 69:3, 69:6,
69:15, 73:1, 73:5,
73:6, 78:16,
80:24, 81:13,
82:13, 82:25,
84:13, 88:21,
93:2, 96:7, 96:25
fairly [3] 65:5,
79:2, 79:3
familiar [12] 13:5,
13:6, 32:25, 33:2,
60:24, 70:9, 71:7,
92:9, 92:10,
92:14, 92:18,
92:18
familiarize - 51:15
faraday [52] 24:7,
24:8, 24:9, 24:19,
24:19, 24:21,
25:20, 26:19,
27:13, 45:8,
45:10, 45:10,
46:11, 46:15,
46:18, 46:20,
46:21, 46:23,
47:4, 48:18,
48:20, 48:22,
48:25, 49:12,
86:25, 88:14,
88:23, 88:24,
88:25, 89:1, 89:4,
89:6, 89:10,
89:11, 89:14,
89:15, 89:18,
89:19, 89:21,
90:2, 90:4, 90:6,
90:10, 90:11,
90:18, 90:23,
90:24, 91:4,
91:16, 97:11,
97:14, 100:11
fashion - 48:4
favor - 30:5
federal [6] 1:17,
3:8, 7:5, 33:3,
33:6, 101:8
fees - 60:9
felt - 79:3
Feniff - 18:2
field - 12:16
Fifth - 21:16
figure - 103:1
figured - 99:25
figuring - 20:18
file [2] 12:2, 30:15
filed - 30:7
filing [4] 3:20,
101:25, 102:9,
103:22
filings [2] 102:3,
102:11
filled - 22:2
final [4] 41:15,
42:13, 53:1,
71:20
finally [4] 17:1,
38:14, 41:6,
93:25
financial - 7:1
fine [2] 103:6,
103:10
fingerprint - 17:10
fingerprints [2]
65:10, 65:14
finished - 39:3
finishes - 104:6
finishing - 22:24
fit - 51:21
flag - 74:16
flagging - 77:20
flexible - 103:19
flooded - 52:6
Florida [24] 8:15,
42:10, 42:18,
43:17, 43:19,
43:24, 54:14,
67:15, 67:16,
68:21, 73:18,
78:3, 79:23,
81:14, 82:15,
82:21, 83:16,
86:3, 86:4, 89:18,
91:13, 98:10,
98:19, 100:2
follow - 79:17
followup - 76:20
footnote [7] 61:14,
61:15, 61:25,
62:6, 62:14,
62:16, 63:5
force [2] 10:9,
101:1
foregoing - 105:4
forensic [10]
23:16, 23:21,
23:24, 24:2, 25:1,
25:3, 25:8, 27:11,
56:8, 89:14
forensics [2] 24:7,
26:2
forgetting - 101:3
formal - 66:22
formally - 47:18
forth [2] 4:5, 56:20
forward - 94:4
Fourth [2] 92:11,
92:19
frankly [2] 102:24,
103:25
fraud [4] 9:4, 9:4,
9:5, 60:7
frequently [2] 21:9,
90:8
Friday [5] 27:3,
46:14, 47:4,
48:17, 104:5
front [5] 56:19,
56:22, 56:23,
69:10, 71:19
frustrated - 84:14
frustrating - 84:19
full [2] 17:16,
26:11
fully - 17:8
future - 45:7
fuzzy - 96:19

G

gain [2] 17:13,
65:11
gave - 84:5
general [5] 7:11,
25:3, 25:7, 89:20,
89:21
generally [13]
6:23, 9:2, 11:18,
13:5, 13:8, 13:19,
18:20, 19:19,
28:13, 33:2,
33:10, 50:23,
89:22
Gentleman's -
62:14
gently - 75:14
gets - 32:15
girlfriend [2] 21:10,
22:8
girlfriend's [4]
20:20, 22:5, 22:8,
74:15
gist [2] 92:25,
96:10
given [2] 3:20,
103:1
giving [6] 31:13,
48:1, 48:3, 50:8,
51:20, 78:18
goal [3] 17:20,
25:9, 25:12
goes [2] 12:12,
94:24
gone [6] 43:19,
78:19, 79:22,
82:22, 82:24,
87:19
gotten [3] 91:1,
91:8, 91:9
Goverment - 47:12
Government [64]
2:6, 3:5, 5:17,
5:20, 8:16, 8:21,
10:14, 10:19,
12:23, 21:19,
21:24, 29:1, 29:6,
30:24, 31:4,
32:16, 32:21,
35:1, 35:6, 36:24,
37:4, 37:15,
37:20, 38:3, 38:8,
39:10, 39:15,
40:17, 40:25,
42:1, 42:2, 42:6,
47:7, 48:6, 48:11,
49:2, 49:7, 49:20,
49:25, 52:19,
52:24, 53:11,
53:16, 54:16,
54:21, 55:9, 57:3,
57:6, 57:9, 73:17,
73:21, 93:18,
94:3, 94:14,
94:22, 95:15,
101:17, 101:19,
102:7, 102:9,
102:10, 103:5,
103:22, 104:18
Government's [22]
3:16, 3:18, 7:19,
9:14, 11:2, 28:5,
29:23, 31:7, 34:3,
35:9, 37:6, 38:10,
40:4, 44:1, 48:13,
49:9, 50:2, 54:5,
55:14, 61:3,
93:15, 93:16
Graaf [2] 1:15, 3:6
Grand [3] 3:22,
52:9, 52:16
grandchild - 60:8
grandparent [3]
9:4, 62:1, 62:4
grant - 71:1
Green [40] 20:11,
20:12, 20:15,
20:18, 20:21,
21:2, 21:8, 22:2,
22:6, 58:22,
58:23, 59:1, 59:4,
59:5, 59:7, 59:7,
59:15, 60:11,
60:14, 61:16,
61:18, 61:22,
62:7, 62:10,
62:15, 62:15,
62:19, 62:22,
62:23, 62:25,
63:5, 63:7, 63:10,
63:11, 63:12,
63:20, 64:5, 66:6,
66:7, 66:14
Green's - 59:11
Greens - 59:12
Greg - 72:19
group [7] 19:8,
22:6, 23:12,
23:16, 23:21,
23:24, 27:11
guess [7] 4:25,
5:11, 59:14,
62:17, 85:11,
87:8, 91:6
guys [2] 25:5,
88:17

H

half [5] 18:24,
19:7, 20:23, 21:1,
55:11
Hamilton - 104:11
handful - 23:1
handling - 13:7
hang - 99:22
happen - 25:12
happened [3]
18:13, 20:3, 22:1
happening - 90:5
having - 92:17
he's [13] 19:7,
32:12, 40:10,
46:1, 46:1, 46:8,
53:8, 53:9, 94:11,
94:23, 104:2,
104:5, 104:10
heading - 11:7
heads [3] 31:13,
48:2, 48:3
hear [2] 4:21,
91:22
heard [2] 41:6,
102:18
hearing [7] 3:9,
3:21, 3:24, 4:3,
4:19, 55:3, 95:12
heart - 94:24
hectic - 67:2
held - 39:19
helpful [3] 5:1, 5:3,
90:15
helping [2] 14:9,
90:15
hey - 88:17
higher - 25:16
himself - 51:15
historical - 9:24
history [10] 58:24,
59:4, 59:8, 59:10,
59:11, 59:16,
59:21, 60:2,
62:17, 63:8
hold - 52:12
Holland [2] 70:23,
92:17
Hollands [3] 70:10,
70:12, 73:8
Homeland [4] 10:4,
89:17, 100:17,
100:20
Honor [76] 3:16,
4:8, 4:17, 5:10,
5:14, 5:17, 5:20,
8:16, 8:19, 10:14,
10:17, 12:18,
12:21, 21:22,
29:4, 29:10, 31:2,
32:16, 33:24,
35:4, 37:2, 37:18,
38:6, 39:10,
39:13, 40:23,
47:10, 48:9, 49:5,
49:23, 52:22,
53:14, 54:19,
55:6, 55:9, 55:15,
55:18, 56:2, 57:7,
57:8, 60:15, 61:1,
61:6, 61:9, 71:9,
71:12, 73:10,
74:7, 76:11,
78:12, 85:22,
91:19, 91:25,
92:4, 92:5, 93:10,
93:12, 93:22,
94:14, 95:1,
95:18, 95:25,
96:21, 97:22,
98:12, 101:19,
101:23, 102:6,
102:8, 102:14,
102:25, 103:5,
103:12, 103:21,
104:15, 104:19
Honor's - 56:18
Honorable [3] 1:13,
67:10, 69:11
hoping [2] 48:2,
81:19
hot - 89:20
hour [5] 20:25,
51:5, 51:8, 51:11,
55:11
hours [3] 50:23,
51:4, 51:13
However - 67:18
HRT [2] 36:15,
101:3
HSI [33] 10:9,
12:9, 12:11,
12:16, 17:25,
18:1, 22:4, 23:11,
23:12, 23:15,
26:22, 27:11,
30:2, 30:19,
34:20, 37:9, 41:6,
41:20, 42:14,
44:11, 45:24,
47:3, 49:12, 81:4,
81:14, 81:22,
83:2, 86:16,
89:25, 96:7,
96:14, 100:10,
100:16
HSI's [2] 30:3,
36:14

I

iCloud [2] 4:4,
4:12
ICM [2] 30:4,
30:15
idea [3] 68:12,
92:10, 92:19
identified [2] 57:4,
59:1

III - 1:13
imagine - 90:17
imaging - 16:18
immediately [3] 24:1, 78:17, 93:5
impeach - 95:16
import - 72:21
in-person - 87:22
inaccurate [3] 19:10, 62:22, 94:19
incarceration - 57:21
incident - 74:14
include [3] 16:12, 23:7, 41:17
included [5] 16:24, 20:17, 67:23, 68:7, 68:20
includes - 10:9
including [5] 14:13, 42:13, 47:21, 66:24, 67:24
incoming - 24:12
incriminatory - 95:13
independent [2] 88:4, 88:19
independently - 102:10
indicate [9] 28:23, 29:14, 30:21, 32:7, 44:15, 46:5, 51:18, 52:4, 83:16
indicated [5] 51:24, 54:10, 59:20, 60:1, 96:7
indicates - 85:1
indicating [2] 72:4, 102:15
indicted - 9:8
indictment - 9:11
individual [9] 7:6, 15:13, 59:20, 61:16, 61:17, 62:6, 62:9, 67:18, 86:24
individuals [6] 20:6, 20:7, 20:8, 20:9, 96:12, 100:15
info [2] 38:2, 42:14
Info@capitolcour - 1:25
inform [3] 28:15, 75:14, 103:4
information [34] 9:25, 10:10, 14:22, 15:2, 18:18, 18:20, 19:10, 20:19, 21:2, 30:9, 30:22, 34:8, 35:15, 36:22, 37:12, 37:13, 38:16, 38:19, 38:21, 38:22, 41:20, 41:24, 44:14, 46:9, 47:17, 69:17, 72:8, 72:8, 77:18, 78:4, 78:8, 82:7, 96:8, 96:12
informed - 50:17
informing [2] 41:5, 44:5
informs [2] 32:9, 36:5
initial [8] 32:10, 34:15, 35:11, 35:13, 42:22, 63:25, 81:18, 84:18
initially [2] 20:4, 42:24
inquired [2] 87:2, 87:16
inquiries [2] 88:4, 88:12
inquiring [3] 87:20, 88:13, 96:13
inside [3] 24:7, 24:18, 65:20
insight - 86:22
instance - 82:15
integrity - 24:14
intel - 15:16
intend [5] 11:25, 12:4, 15:13, 16:10, 102:9
intended [2] 10:13, 15:25
intention - 3:17
interesting - 76:1
internal [4] 7:1, 12:11, 33:16, 47:21
internally [2] 31:16, 32:14
internet - 104:15
interview - 64:21
interviewed [3] 11:20, 58:22, 64:6
interviews - 11:17
investigate [2] 6:25, 82:22
investigating [2] 61:21, 62:3
investigation [11] 6:20, 8:24, 9:3, 10:7, 10:22, 31:16, 68:18, 90:13, 90:15, 100:19, 101:11
Investigations [2] 10:5, 100:21
investigative [9] 14:2, 18:8, 19:2, 22:21, 22:24, 27:15, 36:13, 36:17, 89:3
investigator - 6:22
investigators - 26:17
involved [5] 23:13, 23:16, 68:12, 101:8, 101:11
involving [2] 9:5, 60:7
iPhone [7] 22:20, 24:21, 25:6, 27:8, 41:9, 54:24, 55:4
IRS [14] 5:21, 6:20, 18:1, 31:16, 32:13, 32:23, 33:5, 33:16, 47:24, 52:13, 76:1, 77:3, 80:12, 100:19
isn't - 76:7
issue [8] 4:5, 72:24, 73:7, 74:16, 85:8, 88:23, 91:9, 102:13
issued [4] 9:11, 9:12, 58:14, 59:24
issues [2] 92:22, 94:25
items [6] 16:10, 23:5, 23:7, 23:19, 27:7, 37:10

**J**

jail - 40:11
JoAnn [2] 1:20, 105:10
job [3] 6:23, 82:14, 101:4
Josh - 18:2
judge [20] 1:13, 13:13, 51:10, 51:12, 53:25, 67:16, 68:5, 68:6, 68:10, 68:15, 70:6, 70:21, 70:25, 71:25, 72:4, 73:11, 78:10, 98:20, 98:24, 99:1
judicial - 73:13
July [2] 1:10, 105:8
jurisdiction - 58:13
Jury [3] 3:22, 52:9, 52:16

**K**

Kevin [24] 12:12, 12:15, 22:12, 34:19, 35:12, 36:6, 38:13, 38:24, 39:4, 39:5, 41:25, 44:14, 45:25, 45:25, 46:14, 47:17, 49:18, 50:17, 53:7, 77:18, 80:4, 80:5, 80:19, 80:20
keyed - 57:10
Khalladi [66] 1:5, 3:5, 7:6, 7:15, 8:1, 8:25, 9:7, 9:20, 10:12, 11:1, 14:14, 15:4, 15:22, 18:22, 19:6, 20:8, 20:10, 20:16, 20:21, 20:25, 21:5, 21:17, 22:3, 22:8, 22:14, 22:16, 22:18, 22:22, 23:2, 24:3, 26:17, 27:5, 27:8, 38:23, 38:25, 39:18, 40:11, 40:14, 44:6, 45:5, 54:25, 55:5, 56:25, 58:1, 59:21, 60:2, 61:18, 61:22, 61:23, 62:3, 62:9, 62:18, 63:8, 64:7, 65:10, 65:17, 66:5, 66:8, 66:11, 67:2, 68:19, 68:25, 85:3, 94:1, 94:15, 101:12
Khalladi's [33] 11:6, 11:9, 16:1, 17:6, 17:13, 20:20, 21:3, 22:18, 23:20, 23:25, 24:21, 28:2, 40:10, 40:12, 41:10, 46:7, 47:19, 54:8, 54:13, 54:24, 58:17, 59:2, 59:6, 63:14, 64:11, 69:8, 69:18, 73:24, 74:13, 75:13, 76:21, 85:9, 97:20
knowing - 102:12
knowledge [11] 22:15, 24:25, 25:4, 25:7, 26:2, 80:16, 80:21, 80:22, 88:11, 90:6, 101:5
knowledgeable - 81:7
knows - 57:8

**L**

lab - 89:14
lack [2] 83:22, 93:1
landed [3] 53:10, 53:21, 54:3
lastly - 46:25
lasts - 45:15
later [3] 40:15, 77:22, 81:25
laundering [3] 7:2, 7:13, 9:5
law [7] 11:15, 11:24, 26:6, 92:20, 101:8, 104:1, 104:7
lawyer - 32:13
lawyers - 4:16
layer - 33:15
layers [2] 31:18, 32:13
lead [2] 81:6, 103:1
leading [2] 75:18, 97:23
learn [2] 14:5, 15:1
learned [3] 53:22, 54:3, 62:21
lease - 14:10
least [6] 63:18, 66:6, 80:22, 97:13, 102:4, 102:21
leave [2] 58:7, 66:12
leaving [3] 58:4, 104:3, 104:5
led - 20:17
legal [4] 4:3, 5:4, 5:7, 60:9
lend - 90:18
lengthy [4] 13:19, 13:22, 81:19, 97:19
lent - 89:24
less - 92:21
let's [4] 42:24, 55:22, 55:24, 104:16
letterhead - 43:6
level [2] 31:20, 32:4
levels - 77:4
liked [3] 84:15, 93:8, 93:9
likely [6] 4:12, 43:1, 50:25, 51:25, 77:7, 95:15
likes - 51:12
limit - 102:22
limited - 25:2
Lisette [3] 67:11, 67:15, 69:11
listed - 79:10
literally - 46:10
living [9] 25:5, 59:1, 59:6, 59:12, 59:20, 61:18, 61:23, 62:9, 63:7
locate [2] 10:12, 67:3
located [4] 8:13, 21:3, 22:7, 39:18
locating - 22:14
location [26] 9:25, 10:10, 14:11, 14:14, 14:22, 15:1, 15:21, 18:11, 18:15, 18:18, 18:25, 19:9, 19:13, 19:18, 19:19, 20:25, 21:7, 21:13, 21:15, 22:23, 27:1, 52:9, 52:16, 66:5, 69:19, 74:15
locations [2] 84:7, 93:5
locked [3] 25:25, 26:3, 26:7
log - 24:15
logistics [2] 44:9, 79:12
London [6] 36:6, 36:10, 78:24, 79:21, 84:8, 84:12
longer - 77:11
looking [3] 63:4, 71:16, 102:5
looks - 65:2
Los - 13:24
lost - 98:3
lots [3] 19:11, 19:23, 20:1
luxury - 19:25

**M**

madam - 95:10
Magistrate [9] 13:13, 51:10, 51:12, 53:24, 67:15, 92:12, 92:13, 92:21, 92:22
mail [6] 46:11, 46:18, 46:23, 60:7, 86:25, 90:13
mailed [5] 49:12, 88:21, 90:3, 90:24, 99:7
mailing - 88:15
major [3] 67:5, 67:5, 89:3
majority - 34:22
makes [2] 79:16, 90:21
making - 88:4
management - 30:4
manager [4] 14:11, 64:23, 65:6, 65:8
managers - 64:21
manipulated - 24:15
manipulation - 25:21
map - 21:13
marijuana - 59:17
Mark [8] 32:9, 32:10, 32:10, 32:11, 32:12, 33:19, 47:22, 77:10
marked [19] 7:18, 9:13, 11:2, 21:11, 28:4, 29:23, 31:6, 34:3, 35:8, 37:6, 37:22, 40:3, 41:2, 43:25, 49:9, 50:2, 53:1, 54:5, 57:24
Maryland [4] 60:6, 61:22, 63:1, 63:21
match - 59:11
material [2] 52:16, 104:2
materials - 70:15
math [2] 96:19, 103:18
matter [4] 3:9, 71:24, 72:18, 105:6
maybe [9] 42:20, 45:15, 59:16,

72:12, 75:19, 79:10, 87:12, 98:18, 103:8
means - 90:3
meant [8] 72:3, 72:4, 72:12, 72:14, 72:17, 74:25, 75:5, 86:7
mechanism - 24:13
media [2] 16:12, 16:19
meet - 18:10
meeting - 18:23
members [2] 27:15, 36:19
memo - 47:21
memory [9] 59:10, 59:16, 59:18, 63:2, 63:6, 88:7, 88:7, 99:20, 99:23
mentioned [12] 3:13, 8:3, 11:8, 16:10, 16:21, 17:23, 25:6, 32:23, 39:21, 51:4, 51:8, 92:24
message [5] 30:21, 46:12, 46:13, 50:12, 51:22
messages - 47:1
Miami [90] 8:14, 8:15, 11:5, 12:9, 12:14, 12:16, 13:9, 13:25, 14:16, 15:5, 15:9, 17:23, 18:22, 19:8, 19:11, 19:21, 19:21, 21:6, 21:14, 22:4, 23:13, 26:23, 27:2, 27:4, 27:9, 30:6, 30:16, 30:18, 30:19, 34:7, 34:20, 35:15, 38:20, 39:19, 41:6, 41:21, 42:14, 44:16, 44:18, 44:24, 46:1, 46:1, 46:17, 46:19, 47:3, 48:18, 49:13, 49:15, 49:18, 50:7, 50:17, 53:7, 54:14, 59:25, 64:18, 80:13, 81:5, 82:15, 82:21, 83:6, 86:14, 86:18, 86:23, 87:17, 88:12, 88:14, 89:1, 89:7, 89:11, 89:18, 89:25, 90:11, 90:16, 90:23, 91:11, 91:16, 93:2, 96:7, 96:14, 97:4, 97:6, 97:13, 97:17, 97:21, 98:5, 99:14, 99:22, 99:24, 100:10, 100:25
Miami's - 23:11
Michael - 40:8
mile [3] 18:24, 18:24, 20:23
mind [3] 69:13, 78:2, 84:22
minimal - 41:22
minute - 55:23
minutes [4] 55:21, 55:24, 76:19, 98:17
missed - 59:23
missing - 77:18
mix-up [2] 63:24, 64:1
mixed - 59:13
mode [2] 26:15, 26:18
moment [10] 5:8, 8:3, 11:8, 16:21, 31:23, 33:24, 34:17, 55:6, 64:16, 93:10
Monday [7] 46:7, 48:23, 49:13, 50:6, 50:18, 53:6, 91:7
money [4] 7:2, 7:13, 9:5, 60:8
monitoring [2] 57:17, 57:19
months [2] 52:7, 94:9
morning [2] 41:6, 67:1
motion [14] 1:9, 1:10, 3:9, 3:10, 3:17, 3:19, 3:22, 3:25, 4:1, 4:18, 4:21, 4:22, 4:24, 69:9
motions [3] 3:13, 4:15, 102:21
move [28] 8:17, 10:15, 12:19, 21:19, 29:1, 30:24, 32:17, 35:1, 36:24, 37:15, 38:3, 39:11, 40:17, 42:1, 47:7, 49:2, 52:8, 52:12, 52:17, 61:1, 61:6, 71:9, 74:3, 74:23, 76:11, 85:21, 90:1, 93:13
moved [2] 84:16, 91:20
moves [5] 48:6, 49:20, 52:19, 53:11, 54:16
moving [3] 75:24, 83:16, 103:23
Mulligan [4] 32:12, 33:20, 47:22, 77:10
myself [5] 10:9, 20:17, 28:7, 31:10, 50:4

**N**

named - 62:9
Nancy [3] 30:1, 30:11, 30:12
Nashville [5] 36:6, 39:8, 78:25, 79:21, 84:9
Nate - 85:2
Nathanael [2] 1:15, 3:7
nature [3] 9:2, 10:24, 34:7
Neal - 20:10
necessarily - 93:7
necessary [11] 4:20, 4:23, 47:23, 97:7, 102:2, 102:16, 102:17, 102:19, 103:4, 103:9, 103:12
needed [18] 34:8, 35:15, 37:10, 39:3, 39:6, 46:21, 50:21, 52:8, 60:8, 69:20, 78:7, 79:10, 88:23, 89:4, 97:11, 97:14, 100:6, 100:6
needing - 11:22
needs [6] 31:17, 32:14, 33:18, 46:5, 73:4, 85:8
neither [2] 20:7, 58:11
nexus - 4:4
nice - 19:25
nobody - 58:18
None - 57:24
north - 18:25
Northeast - 21:16
Northern [8] 7:9, 7:24, 11:9, 40:9, 56:25, 58:1, 58:3, 58:11
notation [2] 63:18, 72:21
note [4] 24:4, 60:21, 74:12, 76:24
notes - 71:17
nothing [3] 6:5, 55:8, 98:11
notice [3] 50:24, 73:2, 73:13

**O**

O-S-T-R-U-M - 5:25
object [4] 94:3, 94:15, 94:22, 97:22
objection [35] 8:18, 10:16, 12:20, 21:21, 29:3, 31:1, 32:18, 32:19, 35:3, 37:1, 37:17, 38:5, 39:12, 39:13, 40:21, 42:3, 47:9, 48:8, 49:4, 49:22, 52:21, 53:13, 54:18, 61:8, 71:11, 74:6, 76:13, 76:15, 78:12, 85:23, 85:24, 92:5, 93:19, 93:20, 97:24
observed - 80:4
obtain [3] 13:1, 13:10, 44:23
obtained [7] 1:10, 3:11, 10:21, 42:21, 54:23, 69:7, 97:20
obtaining [4] 28:1, 42:17, 47:24, 97:1
obviously [3] 19:6, 62:23, 82:3
occasions - 65:15
occur - 28:13
occurred [4] 23:15, 29:15, 44:20, 63:9
occurs - 96:1
October [2] 70:22, 72:12
offense [2] 63:1, 63:22
office [17] 12:9, 12:16, 13:12, 23:11, 23:13, 24:2, 24:7, 33:13, 33:17, 33:23, 52:6, 52:15, 72:17, 90:1, 96:14, 98:7, 99:22
officer - 10:9
offices - 89:24
oftentimes - 11:20
opened - 12:3
opening - 78:2
opine [2] 37:14, 44:10
opined - 19:8
opposed [2] 92:12, 96:13
order [3] 7:25, 69:3, 73:11
Ostrum [22] 2:3, 5:21, 5:24, 5:24, 6:6, 6:9, 6:10, 6:16, 29:9, 40:20, 56:5, 63:2, 63:23, 76:3, 76:6, 77:16, 79:19, 79:25, 80:17, 92:10, 93:18, 101:16
OT - 36:5
otherwise [2] 16:18, 89:4
Otmane [3] 1:5, 3:5, 7:6
outcomes - 25:12
outfits - 83:2
outgoing - 24:12
outside [3] 11:18, 65:19, 82:14
overlap - 57:10
overnight [4] 44:11, 46:6, 97:8, 97:18
overnighted [2] 90:23, 90:25
overruled - 97:24

**P**

p.m [7] 3:1, 28:25, 30:1, 35:25, 40:13, 47:2, 104:21
P.O [2] 1:16, 1:23
package [2] 68:10, 70:14
pages [4] 31:8, 34:4, 35:9, 44:1
paperwork - 48:4
paragraph [6] 16:14, 17:1, 51:17, 63:15, 64:22, 71:20
paragraphs - 51:21
Pardon - 4:10
participate [2] 8:24, 57:16
participated - 13:24
participating - 10:6
particular [32] 9:21, 10:1, 10:2, 11:19, 12:3, 12:6, 13:1, 14:11, 15:11, 15:18, 16:7, 16:14, 16:23, 23:12, 26:21, 38:24, 41:18, 57:14, 58:7, 58:19, 60:18, 60:21, 62:16, 62:25, 64:21, 65:25, 72:24, 77:5, 94:25, 104:1, 104:7, 104:8
partly - 43:17
partner - 100:21
pass [3] 26:3, 26:9, 32:9
password - 25:22
Paul [18] 1:15, 3:6, 10:4, 10:8, 17:25, 27:18, 27:20, 44:4, 45:24, 46:14, 47:2, 53:6, 86:6, 86:8, 86:25, 87:8, 100:23, 100:24
penalties - 6:2
pending - 40:1
per - 37:14
perform [2] 17:16, 25:10
performed - 11:18
perhaps [2] 96:19, 102:25
period [6] 42:22, 50:10, 51:6, 51:9, 89:25, 94:9
perjury - 6:3
permit - 16:18
permitted - 17:6
personal - 80:15
perspective - 67:3
pertains - 8:3
phones [11] 16:12, 17:10, 23:8, 25:1, 36:3, 67:24, 68:8, 68:20, 70:22, 83:2, 90:9
phonetic [2] 18:2, 20:10
photos - 80:6
physical [3] 17:6, 17:13, 80:5
piece [2] 15:24, 16:2
Pike [15] 18:1, 44:5, 47:2, 48:17, 49:11, 50:17, 86:13, 86:15, 86:17, 86:21, 87:8, 87:15, 88:12, 88:13, 88:16
Pine - 1:18
pipe - 52:8
Plaintiff - 1:16
plan [2] 50:5, 100:14
planned [3] 27:17, 27:19, 27:19
plans - 32:7
please [5] 6:1, 6:5, 6:15, 46:6, 86:11
plugged [5] 24:6, 25:19, 45:9, 45:11, 45:17
point [27] 3:18, 3:20, 12:18, 14:1, 14:16, 20:12, 21:14, 32:5, 33:22, 39:24, 41:8, 41:15, 50:16, 54:25, 59:17, 63:6, 75:19, 79:8, 80:2, 81:19, 88:14, 89:5, 90:14, 90:21, 97:10, 99:24, 100:5
pointed [2] 72:23, 99:6
points - 65:5
portable [2] 44:11, 45:2
portion - 24:2
pose - 34:22
posed - 82:6
possibility - 103:5
possible [4] 26:13, 51:25, 81:6, 88:9
potential [2] 6:25, 25:20
potentially - 57:20
power [4] 25:19, 45:11, 45:17, 46:11
powered [2] 25:15, 45:8
powered-on [6] 24:4, 24:6, 25:7,

27:13, 45:4, 45:6
precaution - 26:20
preferable - 26:8
preference [4] 44:6, 44:15, 44:17, 85:2
preferred - 51:20
preliminary - 4:18
premeet - 18:16
preparation [2] 34:8, 35:16
prepared [3] 5:9, 5:18, 13:4
preparing [2] 34:11, 35:14
presearch - 14:7
present [11] 3:5, 3:7, 5:9, 15:5, 15:13, 20:7, 22:13, 65:17, 65:19, 65:21, 94:2
presently - 96:14
preservation - 56:12
preserving [2] 95:5, 95:6
presiding - 71:25
pressed - 80:10
pressing - 80:11
pressure - 52:12
presumably [7] 15:22, 36:16, 45:17, 80:7, 91:1, 91:3, 91:9
presume [4] 81:23, 83:24, 84:2, 84:19
pretrial [2] 8:11, 58:17
prevent [3] 24:11, 24:18, 24:21
previous [4] 48:17, 86:24, 87:5, 87:21
previously [2] 15:4, 16:10
primarily [2] 4:3, 57:11
primary [6] 21:3, 21:4, 21:7, 41:19, 58:12, 97:1
principal - 23:14
prior [6] 18:8, 33:13, 44:20, 52:7, 53:21, 59:2
prioritize [2] 77:8, 77:11
priority [3] 73:4, 77:24, 83:17
probability - 25:17
probable - 4:5
probably [9] 4:8, 4:11, 25:14, 61:2, 64:16, 72:7, 75:9, 80:1, 87:24
problem [3] 19:7, 47:6, 69:6
problems - 89:1
proceed [8] 3:21, 4:16, 5:10, 19:18, 33:22, 42:16, 75:4, 75:7
proceedings - 105:5
process [38] 12:25, 13:5, 13:16, 13:19, 13:19, 13:22, 13:25, 30:7, 31:16, 31:20, 31:22, 31:23, 32:14, 32:23, 32:25, 33:5, 33:8, 33:16, 33:18, 33:22, 43:19, 44:18, 44:22, 46:24, 47:23, 75:19, 76:25, 77:3, 77:10, 77:15, 81:5, 81:7, 84:15, 89:5, 97:6, 97:19, 98:8, 103:23
processes - 33:2
processing - 22:25
prohibit - 58:4
property [4] 64:23, 65:6, 65:8, 73:2
prosecutor [2] 40:9, 99:6
prospective [3] 9:25, 18:15, 18:17
protect [2] 24:13, 25:20
protected - 25:23
provide [6] 9:24, 26:8, 28:17, 37:12, 39:6, 96:12
provided [4] 38:17, 39:8, 51:9, 73:10
providing [2] 18:18, 46:8
proximity - 3:21
Public [2] 1:17, 3:8
purpose [5] 9:21, 9:24, 10:11, 10:12, 10:13
purposes [6] 14:17, 15:16, 15:17, 45:7, 57:19, 95:5
pursuant [4] 18:18, 23:3, 23:5, 28:2
pursue [2] 43:12, 43:23

Q

questioning - 57:10
quick - 77:8
quicker [6] 83:16, 84:16, 97:6, 97:16, 98:8, 100:1
quickest - 43:22
quickly [8] 5:2, 30:17, 31:22, 45:14, 77:9, 90:9, 102:22, 104:18
quite [4] 61:20, 77:10, 81:18, 91:22

R

raise - 6:1
Randou [12] 12:12, 12:15, 14:2, 22:12, 34:6, 34:13, 34:23, 35:12, 53:7, 78:6, 80:19, 96:6
range - 25:11
rare - 90:7
rarely [3] 21:5, 21:8, 64:6
Rather - 46:17
RCI - 52:6
reach [3] 86:3, 86:6, 87:15
reached [3] 80:12, 87:7, 88:16
reaches [2] 86:6, 86:8
reaching [2] 30:18, 44:8
reading - 71:20
ready - 19:18
real - 24:15
realized - 20:16
really [6] 19:3, 25:18, 39:5, 58:12, 96:2, 99:22
reason [7] 42:19, 43:9, 43:14, 50:21, 68:23, 79:21, 90:1
reasonably - 16:19
reasons [3] 78:18, 99:20, 99:20
rebut - 95:16
receive [5] 35:20, 35:23, 36:21, 37:13, 49:16
received [5] 38:2, 41:20, 55:4, 55:5, 91:10
receiving - 47:17
recent - 65:5
recess [2] 55:23, 55:25
recognition - 17:11
recognize [23] 7:22, 9:14, 11:3, 21:12, 28:5, 29:24, 31:9, 34:4, 35:10, 37:7, 37:23, 37:25, 38:12, 41:3, 44:3, 47:15, 48:14, 48:16, 49:10, 50:3, 53:2, 54:6, 56:24
recollection [8] 27:24, 62:13, 87:18, 88:4, 88:19, 90:22, 91:6, 99:4
record [5] 5:23, 70:3, 87:13, 95:6, 105:5
recovered [2] 1:9, 3:10
recross [3] 2:5, 98:13, 98:15
redirect [3] 2:4, 95:21, 96:4
refer [3] 12:1, 36:15, 80:1
reference - 45:1
referring [4] 34:20, 44:22, 57:11, 100:16
reflect - 28:9
reflected - 87:20
reflects - 41:25
refresher - 72:9
regard [11] 3:24, 4:17, 10:10, 13:16, 38:19, 41:16, 43:8, 45:1, 61:21, 96:16, 96:24
Reid [3] 67:11, 67:15, 69:11
reiterated - 38:16
relate - 4:24
related [8] 4:4, 4:22, 7:1, 7:5, 11:9, 22:24, 36:17, 54:12
relationship [3] 30:12, 30:20, 90:17
relative [2] 6:3, 60:8
relatively [2] 5:2, 45:14
relaying - 88:12
release [4] 7:25, 11:10, 40:1, 56:25
released [5] 7:16, 7:17, 39:22, 39:24, 40:15
relevant [2] 71:23, 94:24
remain [2] 8:10, 27:11
remainder - 22:21
remained [2] 27:4, 43:10
Remind - 84:8
remotely [2] 24:16, 24:22
removed - 45:10
repeat [2] 61:24, 87:12
repeating - 69:14
replies - 49:17
report [4] 30:6, 30:10, 30:17, 58:14
Reporter [2] 1:20, 105:11
REPORTERS - 1:23
request [9] 12:1, 12:6, 12:8, 12:10, 54:25, 55:4, 55:5, 78:2, 91:13
requested [4] 73:17, 89:15, 90:2, 90:2
requesting [2] 17:5, 47:18
require [3] 13:11, 17:10, 17:11
required [7] 50:23, 68:23, 69:16, 69:24, 76:21, 76:22, 80:15
requires - 15:8
reschedule - 55:23
research [2] 63:4, 63:25
reside - 58:7
residence [16] 10:25, 11:6, 13:9, 20:20, 21:3, 21:4, 21:8, 27:7, 58:19, 59:2, 59:6, 59:20, 59:25, 64:11, 64:18, 68:25
residential [7] 11:22, 13:1, 16:1, 43:20, 44:23, 63:9, 98:5
residing - 58:19
resolved - 102:22
respond [9] 34:13, 34:18, 34:23, 36:2, 81:20, 83:23, 102:10, 103:23, 103:25
responded - 74:24
responds [6] 35:25, 38:14, 40:12, 46:14, 47:4, 93:5
response [9] 3:18, 34:16, 35:20, 35:24, 38:17, 49:16, 51:18, 81:20, 82:4
responsibilities [4] 6:24, 36:13, 36:17, 36:18
responsibility - 52:14
responsiveness [2] 43:18, 93:1
result [2] 19:15, 73:6
retrieval - 14:10
return [5] 26:23, 31:23, 54:25, 55:4, 66:14
returned - 27:15
Revenue - 7:1
review [18] 4:1, 4:13, 14:22, 18:14, 31:15, 31:18, 31:20, 33:13, 33:16, 33:18, 41:7, 50:22, 77:3, 77:4, 77:9, 77:11, 77:15, 95:7
reviewed [9] 8:5, 14:20, 16:4, 18:17, 32:14, 33:18, 40:4, 71:8, 94:18
revolved - 28:1
reword - 51:7
right-hand - 6:2
rise - 19:11
risk - 45:16
role [2] 8:23, 24:24
room - 52:9
roommate [2] 20:11, 60:1
run - 58:8

S

Sandy - 40:10
saying [3] 87:10, 87:24, 93:3
says [3] 8:10, 16:17, 81:25
scam [3] 61:21, 62:1, 62:4
scanned [2] 65:10, 65:14
scenario - 25:13
schedule [2] 51:21, 55:11
scheduled - 51:14
scheduling - 102:12
scheme - 60:7
screen - 7:20
search [76] 9:15, 10:25, 11:4, 11:6, 11:7, 11:16, 11:22, 13:2, 13:8, 14:6, 14:11, 14:15, 15:7, 15:11, 15:12, 16:1, 16:4, 16:15, 17:21, 18:12, 18:17, 18:25, 19:4, 19:17, 19:20, 21:6, 21:13, 21:15, 22:23, 22:25, 23:4, 23:6, 23:20, 23:23, 27:1, 28:1, 30:8, 30:23, 31:14, 31:17, 32:24, 33:12, 34:9, 34:11, 35:16, 37:10, 41:7, 41:9, 41:23, 44:20, 44:23, 46:8, 47:19, 54:7, 59:3, 59:19, 59:24, 63:3, 63:10, 63:13, 64:13, 64:17, 67:9, 68:7, 68:7, 69:17, 70:22, 71:4, 71:16, 71:23, 73:3, 74:13, 74:15, 85:13, 92:21, 98:5
searched - 67:25
searching - 22:25
seated - 6:8
Secrecy - 7:2
section [9] 8:8, 8:9, 16:4, 16:8, 16:11, 16:15, 16:23, 17:2, 17:4
Security [4] 10:4, 89:17, 100:17,

100:21
seeing - 73:1
seek [3] 12:4, 96:24, 97:2
seeking [4] 10:11, 32:24, 38:20, 75:8
seemed - 13:24
seize [5] 15:25, 16:10, 25:9, 68:7, 90:9
seized [31] 22:16, 22:17, 22:19, 23:3, 23:5, 23:8, 23:19, 23:23, 23:25, 25:6, 26:16, 26:25, 27:5, 27:7, 27:8, 28:2, 41:10, 45:5, 54:13, 56:12, 56:15, 67:25, 68:24, 68:25, 69:7, 69:18, 70:3, 75:13, 76:20, 85:9, 89:10
seizing [5] 16:1, 16:18, 17:19, 24:5, 73:2
Selent [23] 12:12, 12:15, 14:2, 22:12, 22:17, 22:22, 34:19, 35:12, 36:11, 38:13, 38:24, 41:25, 45:25, 47:18, 49:18, 50:17, 53:7, 65:9, 69:25, 76:22, 77:18, 80:4, 81:2
send [8] 33:16, 46:15, 46:22, 47:3, 48:18, 48:25, 74:23, 89:15
sending [4] 45:25, 50:18, 53:8, 91:4
sense [3] 79:16, 88:2, 90:21
sent [29] 12:8, 28:9, 29:25, 31:11, 32:5, 34:5, 34:10, 35:17, 37:8, 38:13, 44:4, 44:13, 45:20, 46:13, 46:19, 47:16, 48:22, 49:11, 49:13, 51:22, 53:5, 53:7, 81:18, 83:15, 84:16, 87:17, 89:6, 91:6, 91:7
sentences - 41:22
sentencing - 60:6
separate [8] 8:24, 18:19, 20:22, 20:25, 22:6, 22:6, 57:9, 74:12
serious - 89:1
served - 9:16
services - 8:11
SESSIONS - 1:13
setting - 7:25
seven - 103:22
several [8] 14:6, 20:5, 22:4, 79:25, 82:17, 94:9, 99:19, 99:20
shall [2] 6:3, 6:4
share - 64:1
she's [8] 34:20, 36:5, 40:11, 77:22, 78:18, 78:18, 78:19, 78:19
sheet - 57:15
shield - 24:11
ship [15] 44:10, 46:1, 46:9, 48:20, 49:15, 86:4, 87:5, 87:11, 88:25, 88:25, 89:13, 97:15, 99:25, 100:6, 100:10
shipped [10] 45:12, 45:18, 49:19, 50:7, 86:8, 86:19, 87:2, 87:24, 91:15, 97:13
shipping [4] 46:17, 46:24, 97:15, 97:18
shocked - 96:3
shortages - 89:21
shortcircuit - 102:20
shortly - 31:12
showed - 18:22
showing [5] 34:15, 41:2, 49:9, 50:2, 53:1
sic - 53:2
sidebar - 5:15
signal - 26:13
signals [4] 19:12, 24:12, 24:12, 24:16
signature [2] 33:14, 41:24
signed [13] 9:23, 43:22, 51:10, 54:7, 54:8, 67:11, 68:6, 68:12, 68:15, 70:6, 70:25, 86:15, 98:20
significance [8] 15:20, 16:7, 16:9, 16:23, 17:2, 25:8, 26:1, 51:5
significant [2] 17:20, 45:3
signs - 92:13
similar - 41:13
similarities - 60:14
simple - 101:7
simply [2] 33:12, 33:18
site [11] 14:12, 18:25, 20:17, 21:13, 21:15, 22:23, 23:2, 23:8, 23:23, 27:1, 65:24
sitting - 88:20
situation - 14:7
six - 65:15
slightly [2] 13:22, 101:5
smart - 75:20
Smith [8] 3:22, 4:18, 4:21, 4:24, 71:22, 73:7, 92:9, 92:16
sole [2] 55:14, 55:16
solely - 80:3
somebody [3] 26:4, 57:16, 81:15
someone [3] 24:15, 26:8, 45:13
somewhat - 41:13
sooner [2] 43:16, 88:22
Sorry - 57:6
sort [9] 4:18, 45:11, 65:24, 66:20, 66:21, 75:14, 76:23, 90:7, 99:12
sought [2] 42:9, 42:12
sounds [3] 70:8, 88:3, 90:6
source [4] 25:19, 45:11, 45:17, 46:11
south [7] 8:14, 11:5, 19:22, 21:6, 21:14, 59:25, 64:17
southern [10] 19:23, 21:14, 42:10, 67:14, 67:16, 68:20, 73:18, 78:3, 79:22, 91:13
space - 52:17
spare - 90:3
speak [2] 20:12, 66:17
speaking [3] 9:2, 18:20, 33:10
speaks [3] 16:9, 16:11, 17:4
special [29] 5:21, 6:16, 6:22, 6:24, 7:4, 8:23, 10:4, 10:6, 12:15, 13:15, 17:25, 18:1, 23:15, 24:24, 27:21, 33:21, 34:13, 34:23, 36:10, 36:13, 46:4, 48:5, 52:13, 53:6, 65:9, 68:13, 80:12, 81:4, 101:5
specific [2] 13:16, 34:8
specifically [3] 8:8, 24:20, 38:11
specified - 30:23
specify - 36:3
speculating - 51:2
speed - 97:1
spell - 5:23
spoke [2] 11:5, 16:1
spoken - 13:15
spot - 15:16
staff - 20:1
staged - 19:18
stand [2] 94:16, 95:25
start [6] 28:15, 28:17, 28:19, 29:18, 31:14, 35:14
started [2] 43:7, 69:13
starting [3] 30:7, 45:23, 50:5
state [13] 5:22, 6:15, 11:21, 24:4, 25:7, 25:24, 27:13, 45:4, 45:7, 52:14, 74:12, 75:11, 79:13
State's - 72:19
statement - 95:13
states [11] 1:1, 1:4, 1:16, 3:4, 3:6, 7:23, 34:21, 60:5, 70:12, 71:21, 98:6
stating - 79:9
station - 18:11
stationed [2] 83:6, 83:12
status [5] 45:13, 48:19, 87:20, 87:23, 88:1
stay [2] 21:9, 21:10
stayed [4] 22:5, 27:8, 66:7, 66:7
Staying - 64:5
step - 47:23
Steven [2] 1:17, 3:8
stop - 96:2
storage [2] 16:19, 67:23
stored [3] 16:12, 23:17, 23:24
straightforward [6] 76:24, 79:11, 79:11, 79:15, 99:13, 99:15
street [2] 1:18, 21:16
stuck - 100:14
subject [5] 27:24, 54:24, 69:8, 94:20, 96:16
subjected - 94:17
submissions - 103:15
submit [5] 33:13, 94:23, 95:4, 102:11, 102:20
submits - 102:8
submitted [16] 33:14, 53:24, 54:1, 54:1, 54:2, 54:4, 68:5, 68:10, 70:21, 72:5, 77:16, 79:9, 98:24, 98:25, 99:2, 104:2
submitting - 41:23
subparagraph [2] 57:23, 63:15
subparagraphs - 57:22
subpoena [2] 1:10, 3:11
subpoenas [2] 3:22, 4:22
successful - 68:19
sufficiency - 4:4
suggesting [2] 3:23, 102:22
Suite - 1:18
suited - 34:21
sum - 68:2
summary - 94:5
supervisor [5] 31:11, 33:20, 47:16, 77:5, 77:21
supplement [2] 101:25, 102:3
supplemental [3] 102:9, 102:15, 104:17
supplementing - 102:5
support - 46:8
supporting - 47:20
suppress [8] 1:9, 1:10, 3:10, 3:11, 3:13, 3:25, 4:15, 69:9
suppressed - 73:8
suppression - 95:12
surprised [2] 93:1, 93:7
surrounding - 23:14
surveillance - 14:8
suspect [2] 82:21, 94:2
SWAT [5] 36:14, 36:16, 36:18, 81:22, 101:2
swear [9] 6:2, 44:6, 44:16, 44:17, 50:6, 51:1, 51:14, 85:2, 97:5
swearing [7] 41:14, 43:5, 43:20, 48:3, 50:13, 51:25, 67:20
swore [3] 13:3, 70:4, 98:5
sworn [13] 43:16, 50:16, 63:7, 64:25, 65:2, 65:3, 67:10, 67:18, 85:12, 85:14, 85:19, 98:19, 100:12
system - 30:4

## T

taken [3] 36:4, 74:14, 100:3
taking [3] 80:6, 84:14, 84:22
tall - 19:24
task [2] 10:9, 101:1
tasks - 22:24
tax [3] 32:12, 33:19, 47:22
TDY [7] 36:5, 36:8, 39:7, 81:16, 81:21, 82:9, 84:6
team [10] 18:11, 19:2, 22:22, 23:1, 27:15, 36:14, 36:16, 36:18, 81:22, 103:3
technically - 100:5
telling [2] 83:19, 93:6
temporary - 36:9
Tennessee - 36:11
tentative - 50:8
testified [2] 85:22, 89:9
testifies - 95:11
testify [2] 5:2, 94:25
testimony [7] 4:23, 92:24, 94:16, 94:24, 95:12, 102:1, 102:18
TFO - 86:15
Thank [13] 6:1, 6:7, 56:2, 64:5, 74:1, 95:9, 95:20, 96:21, 98:11, 101:14, 101:15, 101:16, 104:20
thanking - 53:8
there's [11] 14:7, 19:23, 25:11, 44:15, 49:14, 64:20, 64:22, 78:5, 86:12, 87:19, 104:1
thereafter [4] 28:14, 32:2, 32:15, 66:17
thinks - 4:23
third [3] 3:25, 51:17, 96:17
thus - 4:2
timely [2] 48:4, 72:5
timing - 3:20
today [6] 26:16, 55:3, 63:14, 69:9, 88:20, 102:1
tomorrow [2] 28:21, 50:13
tone - 75:11
tool - 90:7
tools - 26:6
top [2] 21:16, 28:22
topic [6] 19:1, 19:5, 44:9, 64:5,

75:16, 75:22
towards - 80:5
track - 98:3
tracking - 53:9
trade - 90:7
traffic - 88:8
training [2] 17:9, 25:4
trainings - 82:10
transcript [5] 102:5, 102:23, 103:2, 103:7, 105:4
transfer - 23:20
transferred [2] 24:2, 26:22
travel [4] 12:4, 14:16, 15:9, 17:24
traveled [3] 17:25, 27:3, 82:20
traveling - 17:23
tremendous - 52:7
tried [2] 63:18, 83:18
trouble - 59:17
true [4] 4:9, 4:11, 64:10, 97:10
trusting [2] 90:19, 90:20
truth [2] 6:4, 6:5
TSU - 36:15
Tuesday [11] 29:25, 35:18, 48:19, 48:20, 50:20, 78:5, 103:7, 103:14, 103:14, 103:15, 104:17
Tuesday/wednesda - 50:10
turn [7] 26:13, 70:14, 71:3, 73:20, 84:24, 86:11, 104:18
two-part - 96:18
two-thirds - 57:14
type [2] 22:19, 62:19
types - 80:2
typically [5] 14:8, 14:12, 18:10, 60:8, 83:12

**U**

U.S [10] 13:11, 33:13, 33:17, 33:23, 70:10, 70:23, 72:17, 75:11, 76:1, 104:4
UI - 57:23
UII - 57:23
UIII - 57:24
ultimate [6] 25:9, 25:12, 39:9, 52:14, 80:20, 85:15
ultimately [18] 21:17, 22:7, 22:13, 23:18, 27:1, 32:15, 33:21, 36:21, 39:6, 39:24, 40:15, 41:13, 41:14, 42:23, 43:5, 53:19, 70:4, 78:23
unavailable [2] 51:19, 83:22
unaware - 97:10
undergone - 13:1
undersigned - 71:24
understand [9] 7:14, 15:15, 19:24, 72:9, 83:21, 86:13, 89:24, 90:9, 96:11
understanding [22] 7:11, 8:2, 8:12, 9:18, 12:12, 12:25, 13:18, 22:10, 24:20, 33:7, 39:18, 39:19, 40:14, 51:12, 53:18, 56:18, 75:12, 87:23, 89:17, 89:19, 90:6, 93:4
understands - 104:8
understood [6] 9:22, 15:3, 44:19, 72:3, 81:22, 88:16
undertake [3] 14:8, 15:7, 32:24
undertaken [2] 44:23, 97:19
unfolded [2] 66:23, 66:24
Unfortunately - 95:15
unique [2] 38:22, 72:24
unit [2] 65:20, 65:22
United [11] 1:1, 1:4, 1:16, 3:4, 3:6, 7:23, 70:12, 71:21, 72:19, 98:6, 99:21
unless - 26:3
unlock [2] 17:15, 26:9
unlocked - 25:24
unsure - 74:20
unusual [2] 58:6, 66:20
update [6] 32:3, 32:5, 48:19, 49:14, 86:17, 87:16
updating - 37:8
upon [3] 23:25, 45:19, 102:1
upstairs [2] 22:14, 66:8
using - 77:20
Usually - 14:6

**V**

vacation [2] 27:18, 27:19
vacations - 27:16
Van [2] 1:15, 3:6
variety - 58:8
venue - 42:15
verification - 14:13
verify - 15:12
Vermont [61] 1:2, 1:11, 1:24, 11:19, 13:21, 15:9, 23:15, 26:24, 27:2, 27:2, 27:3, 27:8, 27:16, 30:2, 30:14, 33:8, 35:13, 42:10, 42:12, 42:17, 42:21, 42:25, 43:6, 43:10, 43:13, 43:17, 43:23, 44:7, 44:10, 46:2, 46:5, 46:18, 46:19, 46:20, 53:10, 53:19, 53:21, 54:3, 67:21, 70:5, 82:14, 83:7, 85:3, 85:14, 86:9, 86:16, 87:11, 87:17, 89:7, 91:15, 96:25, 97:2, 97:3, 97:5, 97:8, 98:9, 99:8, 99:17, 100:2, 100:13, 104:13
versus [7] 3:4, 25:17, 26:8, 30:17, 70:12, 71:22, 97:4
via [2] 1:10, 3:11
victims - 60:7
view - 4:7
violated - 58:18
violation - 58:14
violations [2] 6:25, 7:2
visibly - 38:25
vocabulary - 76:7
voluntarily [2] 26:9, 26:10
VT [2] 1:16, 1:18

**W**

waited [2] 85:16, 85:18
waiting - 37:9
walk - 95:25
wanted [3] 26:19, 74:16, 82:1
wants - 60:17
Waples - 72:19
warrant [201] 4:13, 9:11, 9:12, 9:15, 9:21, 9:23, 10:3, 10:11, 10:13, 10:21, 10:24, 10:25, 11:4, 11:6, 11:8, 11:17, 11:17, 11:23, 11:25, 12:7, 13:2, 13:3, 13:8, 13:10, 13:16, 14:3, 14:7, 14:7, 14:15, 14:17, 14:19, 14:23, 15:7, 15:10, 15:11, 15:11, 15:12, 16:1, 16:5, 16:15, 16:17, 16:20, 16:24, 17:3, 17:11, 17:21, 18:3, 18:6, 18:12, 18:12, 18:15, 18:17, 18:19, 19:4, 19:5, 19:17, 19:20, 20:3, 20:24, 21:6, 22:25, 23:4, 23:6, 23:9, 23:20, 28:2, 28:12, 28:20, 29:16, 29:18, 30:8, 30:23, 31:14, 31:19, 32:24, 33:12, 34:9, 34:11, 35:16, 35:19, 37:11, 39:3, 39:20, 41:7, 41:9, 41:24, 42:9, 42:15, 42:17, 42:17, 42:20, 42:25, 43:5, 43:10, 43:10, 43:13, 43:16, 43:20, 43:22, 43:23, 44:7, 44:16, 44:20, 44:23, 46:8, 47:19, 50:6, 50:9, 50:14, 50:15, 50:23, 50:25, 51:9, 51:15, 52:1, 53:23, 54:7, 54:12, 54:23, 59:3, 59:4, 59:9, 59:16, 59:19, 59:24, 60:5, 60:24, 61:2, 62:24, 63:3, 63:10, 63:13, 64:14, 64:17, 64:25, 67:9, 67:11, 67:14, 67:20, 67:23, 68:5, 68:19, 68:24, 69:4, 69:7, 69:17, 69:21, 69:23, 70:4, 70:15, 70:16, 70:18, 70:21, 70:25, 71:1, 71:3, 71:5, 71:16, 71:23, 72:4, 73:3, 73:7, 73:17, 73:23, 74:13, 74:15, 74:20, 74:24, 75:4, 75:7, 75:8, 75:13, 75:17, 76:20, 77:7, 77:11, 78:7, 85:8, 85:13, 85:19, 90:8, 91:13, 92:13, 92:17, 92:21, 92:22, 96:24, 97:1, 97:2, 97:3, 97:5, 97:6, 97:17, 97:20, 98:5, 98:8, 98:18, 98:24, 99:17, 100:1, 100:12
warrants [4] 31:17, 47:24, 77:5, 90:16
watch [3] 65:22, 65:22, 66:1
watched - 66:12
we'll [3] 34:17, 76:11, 82:1
we're [13] 17:14, 19:7, 29:9, 46:9, 50:5, 50:23, 63:4, 63:5, 63:14, 73:23, 73:24, 75:24, 90:19
we've [2] 55:10, 73:16
Wednesday [2] 29:17, 51:2
week [12] 3:19, 13:7, 14:14, 36:6, 36:7, 37:14, 48:3, 82:4, 82:25, 87:5, 102:13, 103:8
what's [6] 4:7, 37:22, 41:2, 61:25, 88:18, 89:5
whatever - 104:9
whether [25] 4:19, 4:20, 5:2, 7:15, 9:7, 9:10, 12:5, 13:18, 22:15, 23:19, 39:22, 42:16, 49:14, 58:23, 68:10, 74:20, 81:15, 87:2, 87:17, 87:20, 87:21, 99:7, 101:25, 103:2, 103:4
who's - 100:21
whole [4] 6:4, 58:8, 81:7, 104:2
whom - 6:19
widespread - 9:5
WILLIAM - 1:13
willing - 30:3
wipe - 24:17
wiped [3] 24:22, 89:2, 89:4
wire - 9:5
Wiseman [2] 31:10, 31:25
wish [2] 4:16, 73:3
wishes [2] 94:15, 101:25
within [8] 23:12, 31:16, 32:23, 33:16, 51:13, 59:25, 83:12, 102:23
witness [16] 2:2, 5:9, 5:10, 5:12, 5:13, 5:15, 5:18, 11:20, 55:12, 55:12, 55:15, 55:16, 56:19, 60:17, 85:22, 93:13
witnesses [8] 5:1, 5:5, 5:6, 5:6, 55:17, 101:18, 101:20, 101:22
wonder - 87:24
wondering [2] 55:11, 86:18
Woods [3] 30:1, 30:11, 30:13
worded [3] 83:20, 92:25, 96:9
wording [2] 64:8, 77:12
works [2] 30:13, 32:13
worried - 91:14
worry - 91:16
wouldn't [8] 26:5, 51:1, 69:16, 78:2, 79:13, 90:17, 91:14, 104:14
writing - 30:7
written [3] 30:10, 42:11, 43:2
wrote [2] 48:21, 77:4

**Y**

yeah [86] 5:11, 7:23, 11:4, 12:11, 17:25, 18:16, 20:16, 21:13, 22:17, 25:24, 27:18, 28:6, 29:12, 29:16, 29:25, 32:3, 32:10, 34:5, 34:12, 35:11, 36:12, 37:8, 38:13, 41:4, 41:11, 41:22, 42:16, 43:11, 43:15, 44:17, 45:4, 46:6, 46:21, 47:16, 48:1, 49:11, 50:4, 51:20, 53:5, 54:7, 57:2, 58:20, 61:17, 63:2, 64:8, 64:12, 66:2, 66:12, 66:19, 66:21, 66:21, 66:25, 68:9, 69:20, 70:17, 71:6, 71:8, 72:7, 72:15, 72:18, 74:25, 75:16, 77:1, 78:9, 78:18, 78:19, 78:23, 79:3, 79:8, 80:17, 81:17, 82:6, 83:1,

83:14, 84:10, 84:15, 85:15, 86:24, 87:4, 87:9, 87:12, 91:3, 98:7, 99:19, 100:9, 103:10
yesterday - 48:22
yet [3] 86:19, 87:2, 87:24
York [8] 7:10, 7:24, 11:10, 40:9, 57:1, 58:2, 58:3, 58:12
you'll [2] 73:21, 74:2
yourself [2] 72:13, 82:9
yup [3] 57:22, 72:15, 85:4